## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re )<br>ZOHAR III, CORP., *et al.*,[1] )<br> )<br> *Debtors.* )<br> )<br>_____ )<br>LYNN TILTON, *et al.*, )<br> )<br> *Appellants,* )<br> v. )<br>ZOHAR III, CORP., *et al.*, )<br> )<br> *Appellees.* )<br> and )<br> )<br>MBIA Insurance Corporation, )<br> )<br> *Intervenor Appellee.* ) | Chapter 11<br>Bankruptcy Case No. 18-10512 (KBO)<br>(Jointly Administered)<br><br><br><br><br>No. 19 Civ. 1874 (MN) |

### OPENING BRIEF OF APPELLANTS

Dated: November 8, 2019

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

**GIBSON, DUNN & CRUTCHER LLP**
Randy M. Mastro (admitted Pro Hac Vice)
Mary Beth Maloney (admitted Pro Hac Vice)
Akiva Shapiro (admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com
mmaloney@gibsondunn.com
ashapiro@gibsondunn.com
(Additional counsel on following page)

---

[1] The Debtor-Appellees, and, where applicable, the last four digits of their taxpayer identification number, are as follows:  Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I," and together with Zohar II and Zohar III, the "Zohar Funds").  The Debtor-Appellees' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

Robert Klyman (admitted Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-70520
rklyman@gibsondunn.com

Monica K. Loseman (admitted Pro Hac
Vice)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

*Counsel to Appellants Lynn Tilton and the
Patriarch Stakeholders*

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ....................................................................................... 1

BASIS OF APPELLATE JURISDICTION..................................................................... 5

ISSUES PRESENTED...................................................................................................... 6

STANDARD OF APPELLATE REVIEW....................................................................... 6

STATEMENT OF THE CASE......................................................................................... 7

     I.     Ms. Tilton Creates the Zohar Funds. .................................................. 7

     II.    Ms. Tilton Files the Chapter 11 Cases in Order to Lift the Cloud of
          Litigation and Unlock the Zohar Funds' Value. .................................... 8

     III.   The Parties Enter into a Settlement Agreement that Provides a
          Fifteen-Month Reprieve from Litigation While the Parties Work
          Jointly to Monetize the Group A Portfolio Companies. ........................ 9

     IV.   The Parties Repeatedly Confirm Their Understanding that the Joint
          Monetization Process Is Limited to a Period of Fifteen Months. ........ 13

     V.    The Zohar Funds Reverse Course and Seek to Indefinitely Extend
          Ms. Tilton's Joint Monetization Obligation......................................... 14

ARGUMENT ................................................................................................................. 17

     I.     The Bankruptcy Court Erred in Failing to Give Effect to the Entire
          Settlement Agreement, Expressly Incorporated by Paragraph 12,
          Which Unambiguously Limits the Joint Monetization Process to the
          Fifteen Month Window....................................................................... 17

     II.    The Bankruptcy Court Erred in Interpreting the Settlement Agreement
          in a Manner that Nullifies Essential Terms of the Parties' Agreement. .............. 22

     III.   The Bankruptcy Court Erred in Adopting an Interpretation of the
          Settlement Agreement that Produces Absurd Results. ........................ 25

     IV.   At the Very Least, the Settlement Agreement Is Ambiguous as to the
          Length of Ms. Tilton's Joint Monetization Obligation, in which Case
          this Court Should Vacate the Order and Remand for Further Proceedings. ........ 29

CONCLUSION.............................................................................................................. 32

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*2009 Caiola Family Trust v. PWA LLC*,
No. 8028, 2014 WL 1813174 (Del. Ch. Apr. 30, 2014) ....................................................4, 27

*AgroFresh Inc. v. MirTech, Inc.*,
257 F. Supp. 3d 643 (D. Del. 2017)..........................................................................4, 25, 29

*In re Catholic Diocese of Wilmington, Inc.*,
484 B.R. 629 (D. Del. 2012) ...........................................................................................6

*In re Cendant Corp. Sec. Litig.*,
181 F. App'x 206 (3d Cir. 2006) ...................................................................................17

*Century Glove, Inc. v. First Am. Bank*,
860 F.2d 94 (3d Cir. 1988)...............................................................................................5

*Charney v. Am. Apparel, Inc.*,
No. 11098, 2015 WL 5313769 (Del. Ch. Sept. 11, 2015) ...............................................25, 28

*Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*,
166 A.3d 912 (Del. 2017) ...........................................................................................17, 18

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000)............................................................................................6

*Coyne v. Fusion Healthworks, LLC*,
No. 2018-0011, 2019 WL 1952990 (Del. Ch. Apr. 30, 2019)...............................................30

*D GYMS, LLC. v. Robino-Bay Court Plaza, LLC*,
No. 3649, 2009 WL 196299 (Del. Ch. Jan. 15, 2009) ........................................................18

*Del. Exp. Shuttle, Inc. v. Older*,
No. 19596, 2002 WL 31458243 (Del. Ch. Oct. 23, 2002)....................................................22

*Dillman v. Chaffinch*,
2003 WL 22415874 (D. Del. Oct. 2, 2003) ......................................................................16

*E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*,
498 A.2d 1108 (Del. 1985) ..................................................................................2, 17, 20

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*,
547 U.S. 651 (2006)..........................................................................................................5

ii

# TABLE OF AUTHORITIES

*(continued)*

Page(s)

*Hudson v. D. & V. Mason Contractors, Inc.*,
 252 A.2d 166 (Del. Super. Ct. 1969) ....................................................................2, 18, 20, 21

*In re Innkeepers USA Trust*,
 442 B.R. 227 (S.D.N.Y. 2010)...............................................................................................28

*Intel Corp. v. Broadcom Corp.*,
 173 F. Supp. 2d 201 (D. Del. 2001)........................................................................................23

*In re Klaas*,
 858 F.3d 820 (3d Cir. 2017)......................................................................................................5

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*,
 68 A.3d 1208 (Del. 2012) .................................................................................3, 22, 23, 24, 25

*Miramar Police Officers' Ret. Plan v. Murdoch*,
 No. 9860, 2015 WL 1593745 (Del. Ch. Apr. 7, 2015) ..........................................................26

*Osborn v. Kemp*,
 991 A.2d 1153 (Del. 2010) ............................................................................3, 22, 25, 26, 29

*In re Owens Corning*,
 419 F.3d 195 (3d Cir. 2005)......................................................................................................5

*In re Ryckman Creek Res., LLC*,
 No. 16-10292, 2018 WL 4178692 (Bankr. D. Del. Aug. 29, 2018) .......................................21

*Salamone v. Gorman*,
 106 A.3d 354 (Del. 2014) ...............................................................................................4, 30

*Sonitrol Holding Co. v. Marceau Investissements*,
 607 A.2d 1177 (Del. 1992) .................................................................................................3, 22

*In re Stone & Webster*,
 558 F.3d 234 (3d Cir. 2009)..............................................................................................1, 17

*Sunline Comm. Carriers, Inc. v. CITGO Petroleum Corp.*,
 206 A.3d 836 (Del. 2019) ...............................................................................................4, 30

*Toibb v. Radloff*,
 501 U.S. 157 (1991)................................................................................................................28

*Wayne Land & Mineral Grp. LLC v. Del. River Basin Comm'n*,
 894 F.3d 509 (3d Cir. 2018).....................................................................................................6

iii

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*In re White Beauty View, Inc.*,
    841 F.2d 524 (3d Cir. 1988)........................................................................................................5

*Zohar II 2005-1 Ltd. v. FSAR Holdings, Inc.*,
    No. 12946, 2017 WL 6761234 (Del. Ch. Dec. 29, 2017), *aff'd FSAR*
    *Holdings, Inc. v. Zohar II 2005-1, Ltd.*, No. 6, 2018 (Del. Jan. 26, 2018) ...............................7

iv

## <u>SUMMARY OF ARGUMENT</u>

Lynn Tilton and the Patriarch Stakeholders (collectively, "Patriarch" or "Appellants")[2] appeal from the Bankruptcy Court's order, A-1 ("Order"),[3] which is premised on a fundamental misinterpretation of the Settlement Agreement governing the Chapter 11 Cases (defined below). The Settlement Agreement was intended to provide a 15-month "breathing spell" from value-destructive litigation (the "15 Month Window"), so that adversarial parties could lay down arms, and over that limited period of time, work together to try to monetize certain companies (the "Group A Portfolio Companies") through a joint process that would maximize value for all stakeholders. *See infra* p. 10. Upon expiration of the 15 Month Window, the Settlement Agreement contemplates restoring the parties to the *status quo ante*: litigation is permitted to resume, and the mandatory joint monetization process ceases. The Bankruptcy Court's Order— issued by a judge who had no involvement in the endorsement of the Settlement Agreement in the first place—turns that core compromise "on its head." *In re Stone & Webster*, 558 F.3d 234, 246 (3d Cir. 2009). It, in essence, forces Ms. Tilton into indentured servitude by requiring her to continue to engage in mandatory joint monetization efforts for the Group A Portfolio Companies long after expiration of the 15 Month Window—and potentially for the rest of her life—for no additional compensation, and under circumstances that render successful monetization all but impossible, as litigation resumes between the parties. By directing such a result, this Order contravenes well-established Delaware law and the parties' intent, as reflected within the four corners of the Settlement Agreement. The Order should therefore be reversed or, at a minimum, discovery ordered and parole evidence considered in resolving this critical issue.

---

[2]  Capitalized terms not otherwise defined have the meanings ascribed to them in the parties' Settlement Agreement.  A-126–135 ("Settlement Agreement" or "Settlement Agmt.").

[3]  Citations to the form "A-__" are to the Appendix being filed herewith.

*First*, the Bankruptcy Court erred by misreading a "particular portion" of the Settlement Agreement, Paragraph 12, in a manner that "runs counter to the agreement's overall scheme [and] plan." *Id.* (quoting *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).  Paragraph 12 required that Ms. Tilton and the Zohar Funds' Chief Restructuring Officer ("CRO") "work jointly *as outlined herein*"—*i.e.*, during the 15 Month Window only—"to monetize the Group A Portfolio Companies" unless (i) "the parties each agree in writing to terminate this settlement agreement . . . in their sole respective discretion" or (ii) certain stakeholders are repaid "in [f]ull," in which case the joint monetization process would have terminated earlier.  Settlement Agmt. ¶ 12 (emphasis added).  Paragraph 12's use of the phrase "herein" "calls special attention to the cardinal rule that one paragraph in a contract cannot be read in isolation, but must be read within the context of the *entire instrument*."  *Hudson v. D. & V. Mason Contractors, Inc.*, 252 A.2d 166, 169 (Del. Super. Ct. 1969) (emphasis added).  The Bankruptcy Court erred by interpreting Paragraph 12 without regard to numerous provisions in the Settlement Agreement that limit the joint monetization process for the Group A Portfolio Companies to a period of 15 months—including Paragraph 14, which references "the 15 Month Window . . . with respect to the Monetization Process"—which are expressly incorporated into Paragraph 12 through its use of the phrase "herein."  When Paragraph 12 is properly interpreted in light of these provisions and consistent with the Settlement Agreement's "overall scheme," *E.I. du Pont*, 498 A.2d at 1113—a 15-month reprieve from hostilities to allow the parties to engage in joint monetization efforts of equal duration—it is clear that the provision sets out the circumstances in which the joint monetization process could have terminated *before* the expiration of the 15 Month Window.  It does not override the overarching temporal limitation by extending Ms.

2

Tilton's joint monetization obligation indefinitely beyond the 15 Month Window.  *See infra* Arg. Pt. I.

*Second*, the Bankruptcy Court erroneously endorsed an interpretation of Paragraph 12 that effectively nullifies numerous other provisions of the Settlement Agreement, in contravention of a "cardinal rule" of Delaware contract interpretation requiring that "all contract provisions be harmonized and given effect where possible." *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1221 (Del. 2012).  For example, the Bankruptcy Court's Order eviscerates large swaths of Paragraph 25:  The Order effectively requires Ms. Tilton to retain authority on behalf of the Group A Portfolio Companies, as their director, manager, and officer, as applicable, so that she can continue working to jointly monetize them.  If Ms. Tilton is removed from these companies, there cannot be a joint monetization process—full stop.  The Order is thus in conflict with, and nullifies, the CRO's authority, under Paragraph 25, to "tak[e] action to remove [Ms. Tilton]" from her positions at the Group A Portfolio Companies, upon expiration of the 15 Month Window (though Patriarch maintains that there are at present no grounds for removal).  And the Order renders "illusory or meaningless" the 15-month limitation contained in various provisions that form the building blocks of the joint monetization process, as those provisions must be effectively extended concurrently with the ongoing joint monetization process that the Order compels in order for the joint monetization process to have any chance of succeeding, as the CRO has previously admitted. *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992); *see infra* Arg. Pt. II (discussing Settlement Agmt. ¶¶ 6, 9, 14, 15, 25) & Arg. Pt. III.

*Third*, the Bankruptcy Court's interpretation of the Settlement Agreement produces absurd results that "no reasonable person would have accepted when entering the contract." *Osborn v. Kemp*, 991 A.2d 1153, 1160–61 (Del. 2010).  "It stretches the bounds of reason to conclude" that

Ms. Tilton, a sophisticated businesswoman with a multitude of responsibilities outside of the Chapter 11 Cases, would have agreed to assume a potentially interminable joint monetization obligation—and for no ongoing compensation. *See id.*; *see also, e.g.*, *2009 Caiola Family Trust v. PWA LLC*, No. 8028, 2014 WL 1813174, at *10–11 (Del. Ch. Apr. 30, 2014) (rejecting interpretation that "would produce arguably absurd results"). Ms. Tilton has experienced firsthand the impossibility of unlocking value the Portfolio Companies' value amidst the suffocating cloud of litigation. She has invested hundreds of millions of dollars and years of her life working to turn around the Group A Portfolio Companies (as well as so-called Group B Portfolio Companies, which are collectively referred to as the "Portfolio Companies"). It is inconceivable that she would have agreed to a potentially endless obligation to work jointly to monetize the Group A Portfolio Companies—with a CRO that otherwise has no right to participate in the sale of those companies— after the stay of litigation she received in exchange has expired, value-depressive litigation is permitted to resume (including actions concerning ownership of those companies), and any prospect of successful joint monetization is effectively foreclosed. The Court should refuse to adopt an interpretation of the Settlement Agreement that imposes such an absurd obligation and result, which no "reasonable person would have accepted" when "entering the contract." *AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 656 (D. Del. 2017); *see infra* Arg. Pt. III.

*Fourth*, the Bankruptcy Court erred by failing to find that, at the very least, Paragraph 12 is "susceptible to more than one reasonable interpretation" when read "in the context of the overall structure of the contract." *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014). Patriarch's reading of Paragraph 12 is the only reasonable one. At a minimum, however, Patriarch has identified "conceivably conflicting terms" that "cannot be indisputably reconciled" without resort to extrinsic evidence. *Sunline Comm. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836,

839–40 (Del. 2019).   Accordingly, before adopting the Zohar Funds interpretation, the Bankruptcy Court should have permitted Patriarch to obtain, and should have considered, extrinsic evidence regarding the parties' intent, including the Zohar Funds' own representations, in prior court filings, that the joint monetization process was limited to a period of 15 months.   *See infra* Arg. Pt. IV.

For these reasons, and as set forth in more detail below, the Court should reverse the Bankruptcy Court's Order or vacate the Order and remand for further proceedings.

## BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction to hear appeals from all "final judgments, orders, and decrees" of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).   "Congress has long provided that orders in bankruptcy cases may be immediately appealable if they finally dispose of discrete disputes within the larger case."  *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 657 n.3 (2006) (internal quotation marks and citation omitted).   The Third Circuit "take[s] a pragmatic approach" to finality in the bankruptcy context by "examin[ing] the practical effect of the court's ruling."  *In re Klaas*, 858 F.3d 820, 826 (3d Cir. 2017).   Bankruptcy orders concerning "issues central to the progress of the bankruptcy petition," and issues "likely to affect the distribution of the debtor's assets, or the relationship among the creditors," are routinely treated as final.  *In re Owens Corning*, 419 F.3d 195, 203 (3d Cir. 2005) (quoting *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 98 (3d Cir. 1988)).   The purpose of this relaxed standard is to avoid "wast[ing] time and resources" by "delay[ing] resolution of discrete claims."  *Id.* (quoting *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988)).   The Bankruptcy Court's Order here decides a discrete legal dispute as to the parties' joint monetization obligations, and it governs disposition of the estate's assets and relationships among the creditors and debtors.   The Order is thus final and this Court has jurisdiction over the appeal.

## ISSUES PRESENTED

1.     Did the Bankruptcy Court err in interpreting the parties' Settlement Agreement to require that Ms. Tilton's obligation to work jointly with the Debtors' Chief Restructuring Officer to monetize the Group A Portfolio Companies extends beyond the 15 Month Window set out in the Settlement Agreement?

2.     Did the Bankruptcy Court err in holding that the terms governing the duration of Ms. Tilton's obligation to work jointly with the Debtors' Chief Restructuring Officer to monetize the Group A Portfolio Companies, when considered in the context of the overall structure of the Settlement Agreement, are <u>not</u> susceptible to more than one reasonable interpretation, such that discovery should have been permitted and extrinsic evidence should have been admitted to resolve any contractual ambiguity?

## STANDARD OF APPELLATE REVIEW

This Court "review[s] the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercises of discretion for abuse thereof." *In re Cont'l Airlines*, 203 F.3d 203, 208 (3d Cir. 2000) (citation omitted); *see also In re Catholic Diocese of Wilmington, Inc.*, 484 B.R. 629, 631 (D. Del. 2012) ("In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions."). The Bankruptcy Court's Order was based solely on a legal determination as to the purported meaning of the parties' Settlement Agreement. *See* A-6 at lines 1–10; A-17 at lines 1–18; *accord* Order at 2. Accordingly, this Court's review of that Order is *de novo*. *Wayne Land & Mineral Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 528 (3d Cir. 2018) ("[C]ontract construction is a question of law reviewed *de novo*.").

## STATEMENT OF THE CASE

### I.      Ms. Tilton Creates the Zohar Funds.

Ms. Tilton created and founded the Zohar Funds, which were innovative distressed debt collateralized loan obligations ("CLOs"). A-23–24. The Zohar Funds raised capital by issuing notes to noteholders who were, in exchange, entitled to interest payments over time, plus return of their principal at the maturity date. A-22–23. From the Zohar Funds' inception to present, Ms. Tilton has remained their sole owner, through entities she owns (directly or ultimately). A-22. The Zohar Funds' assets are primarily loans to distressed companies (the Portfolio Companies). A-23. These loans were originated principally to undervalued, iconic American brands in need of capital and sound management strategy in order to rescue the businesses and restore value, creating and preserving jobs in America. *Id.* In addition, the Zohar Funds hold "equity upside" interests in the Portfolio Companies, entitling them to certain percentages of the net proceeds of a sale of a company—which funds would flow through the Zohar Funds' waterfall to make outstanding principal and interest payments on the Zohar Funds' notes before any residual value is paid to Ms. Tilton as the Zohar Funds' ultimate owner—while Ms. Tilton and her affiliates beneficially own all or almost all of the equity in the Portfolio Companies. *Id.*[4]

Ms. Tilton has been—and remains—actively involved in the management of the Portfolio Companies. A-23–24. She serves as CEO for certain Portfolio Companies and is a board member or manager of each Portfolio Company (and, in most cases, the sole board member or manager).

---

[4]  As detailed *infra*, Statement of the Case ("SOC"), Pt. II, Ms. Tilton's beneficial ownership and control of the Portfolio Companies has been disputed in various pending actions. One trial court issued an adverse control and ownership decision as to three Portfolio Companies, but that judge stayed his own decision pending appeal upon finding that Patriarch's appeal raised "serious legal questions" "worthy of consideration by [the Delaware] Supreme Court." Amended Order, *Zohar II 2005-1 Ltd. v. FSAR Holdings, Inc.*, No. 12946, 2017 WL 6761234, at *1 (Del. Ch. Dec. 29, 2017), *aff'd FSAR Holdings, Inc. v. Zohar II 2005-1, Ltd.*, No. 6, 2018 (Del. Jan. 26, 2018). That appeal was subsequently stayed by the filing of these Chapter 11 Cases, and remains pending.

*Id.* Ms. Tilton has personally invested in and loaned hundreds of millions of dollars to the Portfolio Companies. A-30. Through Ms. Tilton's ownership and control of the Portfolio Companies, she has implemented long-term turnaround plans; over the years, she has successfully revitalized and sold a number of companies, while her work at others continues to maximize their value. A-23–24; *see also* A-38–45.

## II.    Ms. Tilton Files the Chapter 11 Cases in Order to Lift the Cloud of Litigation and Unlock the Zohar Funds' Value.

On March 11, 2018, in her capacity as sole director of each of the Zohar Funds, Ms. Tilton voluntarily filed for Chapter 11 bankruptcy (the "Chapter 11 Cases"). *See* A-25. Prior to the bankruptcy, the Zohar Funds and various stakeholders were mired in protracted litigation across a variety of courts and jurisdictions. The flood of litigation was instigated by MBIA Insurance Corp. ("MBIA"), as the controlling party for Zohar I and Zohar II, and the controlling class of noteholders for Zohar III (the "Zohar III Controlling Class").[5] *See* A-56. Those actions precipitated responsive actions by Ms. Tilton and her entities. A-88. The torrent of litigation included more than a dozen cases, most of which were pending at the time of the bankruptcy filing, that raised complex legal issues and involved virtually all Zohar Fund stakeholders. *Id.* Among those cases were numerous actions seeking declarations as to which party properly controls and beneficially owns the Portfolio Companies, and a now-dismissed civil RICO claim against Patriarch alleging all manner of unsubstantiated wrongdoing, in response to which Patriarch filed claims and actions of its own.[6]

---

[5]   Although the actions were brought nominally on behalf of the Zohar Funds, the litigation was pursued by the Zohar Funds' collateral manager at the time, Alvarez & Marsal Zohar Management ("AMZM"), at the direction of MBIA and the Zohar III Controlling Class. A-24–25.

[6]   *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. 12946-VCS (Del. Ch.) (the "Delaware 225 Action"); *Zohar CDO 2003-1, Ltd. et al. v. Patriarch Partners, LLC et al.*, No. 1:17-cv-00307-WHP (S.D.N.Y.); *Tilton v. Zohar CDO 2003-1, Ltd.*, No. CV-02017-013549 (Ariz. Sup. Ct.);

The litigation cast a cloud of uncertainty over the Portfolio Companies, rendering them unable to obtain critical financing and stalling negotiations with potential buyers and lenders. A-24–25.  As a result, the Zohar Funds were unable to realize the value of their assets:  loans to, and equity upside interests in, the Portfolio Companies.  *Id.*

Ms. Tilton, in her role as each Zohar Fund's sole director, thus elected to file the Chapter 11 Cases in order to lift the intractable cloud of value-destroying litigation that had engulfed the Funds and the Portfolio Companies.  A-25.  In particular, the Chapter 11 Cases were intended to provide the Zohar Fund stakeholders with an opportunity to find a mutually agreeable path forward in unlocking and maximizing the value of the Zohar Funds' assets.  A-25; A-83.

### III.   The Parties Enter into a Settlement Agreement that Provides a Fifteen-Month Reprieve from Litigation While the Parties Work Jointly to Monetize the Group A Portfolio Companies.

Immediately upon commencement of the Chapter 11 Cases, MBIA and the Zohar III Controlling Class filed, directly and through AMZM, a series of motions seeking to dismiss the Chapter 11 Cases and otherwise impose their will on the proceedings.  *See* A-88–89 (summarizing various disputes).  Ultimately, the parties agreed to mediate.  *See* A-89–90.

Over nearly four full days of mediation, the Zohar Funds, Ms. Tilton, the Patriarch Stakeholders, MBIA, and the Zohar III Controlling Class drafted a term sheet.  A-90.  At the time the term sheet was completed, the parties intended that a more comprehensive settlement agreement would follow—as noted in the term sheet itself—which would more thoroughly spell out the entire understanding among the parties.  *See* A-135, ¶ 30 ("The foregoing terms shall be

---

*Tilton et al. v. Zohar III, Ltd., et al.*, No. BC683129 (Cal. Sup. Ct.); *Tilton et al. v. Zohar CDO 2003, Ltd. et al.*, No. 17-016240-CB (Mich. Cir. Ct.); *Zohar CDO 2003-1, Ltd. et al. v. Croscill Home et al.*, No. 1:17-cv-01797-JFB-SRF (D. Del.); *Zohar CDO 2003-1, Ltd. et al. v. Octaluna LLC et al.*, No. 1:18-cv-00108-JFB-SRF (D. Del.).

9

memorialized in a confidential stipulation filed under seal and entry of an order by [the Bankruptcy Court], on terms and conditions satisfactory to the parties."). For example, the term sheet included certain placeholders. *See, e.g.*, A-129, ¶ 4. But a separate stipulation was never completed. Instead, on May 21, 2019, the Bankruptcy Court (Sontchi, J.) entered an order approving the mediation term sheet as the parties' "Settlement Agreement." A-122–25.

The fundamental structure of the deal embodied in the Settlement Agreement was that there would be a mandatory joint monetization process for a finite period of time, during which time the parties would lay down arms and cooperate in certain ways. If sufficient funds were not collected through the joint monetization process during the agreed-upon 15-month time period, the joint monetization would end and the parties would return to the *status quo ante*, with all rights reserved.

In seeking approval of the Settlement Agreement, the Zohar Funds represented that the "Chapter 11 cases" were filed "to obtain a breathing spell from several contentious pending litigations and to create a process to monetize the Debtors' assets through sales or refinancings of the Debtors' interests in the Portfolio Companies" so that they could "unlock and maximize value for the benefit of all the Debtors' stakeholders." A-86. The Zohar Funds reported that "[t]he settlement reached by the Parties provides the framework for the Debtors to do just that, despite the contentious start to these cases." *Id.* And, in fact, the Settlement Agreement did exactly what the Debtors described—it implemented a 15-month "breathing spell" from litigation (the 15 Month Window), *id.*, during which Ms. Tilton and the Zohar Funds' CRO would together engage in a "process to monetize the Debtors' assets" through sales or refinancings, *id*.[7]

---

[7] The parties also agreed that, if certain conditions were met, the 15 Month Window would be extended to a period of 18 months (the "18 Month Extended Window"). *See* Settlement Agmt. at 1. Because those conditions were not met, the 15 Month Window was not extended, and this brief thus refers only to the 15 Month Window unless quoting from the Settlement Agreement or another filing in which the 18 Month Extended Window is referenced.

57772/0001-18123989v1

As relevant here, the Settlement Agreement requires that these parties—Ms. Tilton and the Zohar Funds' CRO—participate during the 15 Month Window in a mandatory joint monetization process for the Group A Portfolio Companies, unless certain conditions were met prior to the expiration of that 15 month period.  Specifically, the Settlement Agreement provides:

> Tilton and the CRO shall work jointly *as outlined herein* to monetize the Group A Portfolio Companies until such times as the (i) parties each agree in writing to terminate this settlement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date.

Settlement Agmt. ¶ 12 (emphasis added).[8]

In numerous other provisions, the Settlement Agreement expressly outlines—the aforementioned "as outlined herein"—the contours and essential components of, prerequisites to, and parties' respective obligations during, the joint monetization process, almost all of which are expressly limited to the 15 Month Window:

- "[D]uring *the 15 Month Window . . . the New Agent shall not have the ability to take any action, declare any default or exercise any remedy* with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and subject to the tolling of claims and other terms hereof."  Settlement Agmt. ¶ 6 (emphasis added).

- "During *the 15 Month Window* . . . all parties agree that *no action shall be taken to remove Tilton* from any such position" "as director, manager and officer, as applicable, of the Group A Portfolio Companies."  *Id.* ¶ 9 (emphases added).

- "*The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window*.  The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during *the 15 Month Window . . . with respect to the Monetization Process involving any Group A Portfolio Company*."  *Id.* ¶ 14 (emphases added).

---

[8]  The "Full Payment Date" is defined as "[t]he date on which the parties or the classes of noteholders on Exhibit A [to the Settlement Agreement] are [p]aid in [f]ull."  Settlement Agmt. at 1.

- *"[A]ny litigation, claim, motion, or contested matter* that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, *shall be stayed during the 15-Month Window*, with appropriate protections so there is no prejudice to any party." *Id.* ¶ 15 (emphases added).

- "*All causes of action* among the Debtors, Other Stakeholders and Patriarch Stakeholders  (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies *shall be tolled during the 15 Month Window* . . . *and all parties' respective rights shall be reserved* with respect thereto, including with respect to venue and jurisdiction." *Id.* ¶ 19 (emphases added).

- "Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be *operated in the ordinary course of business during the 15 Month Window*. . . . *During the 15 Month Window,* the Group A Portfolio Companies and the Group B Portfolio Companies . . . shall be authorized to [] enter into financing transactions with affiliates on market terms, *subject to first consulting with the CRO* or [] issue new equity . . . *subject to first consulting with the CRO*." *Id.* ¶ 20 (emphases added).

- "*Upon the expiration of the 15 Month Window, the Independent Director/CRO may take all necessary and appropriate action* in the best interests of the Zohar Funds without any restriction herein or otherwise, including, but not limited to . . . *taking action to remove Tilton as a director or manager* of the Group A Portfolio Companies, or the Group B Portfolio Companies . . . *Upon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law.*" *Id.* ¶ 25 (emphases added).

Within this framework governing the joint monetization process during the 15 Month

Window, the Settlement Agreement further provides:

- "[TBD: CRO and LT will develop reasonable process milestones related to hiring bankers, . . . .]" *Id.* ¶ 4.

- "The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the 'Monetization Process')." *Id.* ¶ 10.

- "With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio Companies and the Group B Portfolio Companies.  It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best

interests of the Group A Portfolio Companies. . . .  [I]n no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies."  *Id.* ¶ 10.

Finally, the Settlement Agreement provides that Ms. Tilton and the CRO will "negotiate in good faith on how to monetize the Group B Portfolio Companies" if the Zohar Funds' noteholders are not repaid in full by the end of the 15 Month Window.  *See id.* ¶ 3.  Notably, the Group B Portfolio Companies were not referenced in Paragraph 12 of the Settlement Agreement.

## IV.     The Parties Repeatedly Confirm Their Understanding that the Joint Monetization Process Is Limited to a Period of Fifteen Months.

Until recently, the Zohar Funds had never disputed that the joint monetization process was restricted to a period of fifteen months.  To the contrary, the Zohar Funds repeatedly confirmed their understanding that the joint monetization process was limited to the Settlement Agreement's 15 Month Window.  For example, the Zohar Funds represented that:

> [T]he Debtors and their stakeholders . . . have achieved . . . a global resolution of their differences through an agreed-upon ***process to monetize the Debtors' assets over the next 15 and 18 months*** . . . .
>
> The Settlement Agreement provides that the ***Debtors shall have an initial period of 15 months to monetize their assets (the "15-Month Window")***, which is automatically extended for an additional three (3) months (the "18-Month Window"), if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15-Month Window.  *See* Settlement Agreement ¶ 29.  The Settlement Agreement provides that all litigation, motions, and contested matters between the parties to the Settlement Agreement are stayed and tolled during the 15-Month or 18-Month Window, as applicable, ***with all parties' rights reserved***.

A-164–65; A-167–68 (emphases added); *accord* A-208–09.  And in seeking approval of the Settlement Agreement, the Zohar Funds linked the joint monetization process to the "breathing room" afforded by the Settlement Agreement's fifteen-month stay.  *See supra* SOC Pt. III; *see also* A-149 at lines 2–4 (counsel for the Zohar Funds, representing in connection with the Settlement

13

Agreement that "[a]ll litigation [would] be stayed and the parties' rights [] reserved for between 15 and 18 months").

Patriarch similarly confirmed—in a motion filed long before this dispute arose—that the Settlement Agreement "provides for *a fifteen or eighteen month stay of all litigation*, *__during which time__ the Debtors and Tilton*, on behalf of the Portfolio Companies, *are to conduct a joint monetization process*." A-186–87 (emphases added). Tellingly, the Zohar Funds did not take issue with Patriarch's unequivocal description of the Settlement Agreement's "joint monetization process" as limited to the same duration as its "stay of all litigation." To the contrary, they filed a statement in support of the relief requested in Patriarch's motion. A-201–04.

### V.   The Zohar Funds Reverse Course and Seek to Indefinitely Extend Ms. Tilton's Joint Monetization Obligation.

Following the Bankruptcy Court's approval, in May 2018, of the parties' mediation term sheet as the governing Settlement Agreement, Ms. Tilton invested her full effort into the joint monetization process, at great personal expense. A-589. Notwithstanding Ms. Tilton's efforts, the joint monetization process proved largely disappointing. *See id.*; A-530 (the Zohar Funds' Independent Director, noting that "the sales process ha[d] proven exceedingly difficult [even] without any distraction from litigation").

In the final weeks before the Settlement Agreement's 15 Month Window expired, the Zohar Funds took the position, for the first time, that the mandatory joint monetization of the Group A Portfolio Companies was not limited to the 15 Month Window. On August 7, 2019, the Zohar Funds filed with the Bankruptcy Court a motion seeking to compel Ms. Tilton to continue the joint monetization process until the parties mutually agreed to terminate the Settlement Agreement or the Zohar Funds' noteholders were repaid in full. *See* A-222–59. The Zohar Funds'

motion was premised on their (erroneous) reading of Paragraph 12 of the parties' Settlement Agreement. *See id.*

In response to that motion, Patriarch sought discovery to confirm the parties' intent and understanding that the joint monetization process would cease upon expiration of the 15 Month Window. *See* A-262–86; A-308–525; A-577-603. But the Zohar Funds refused to participate in any discovery on the subject, and the Bankruptcy Court ultimately did not allow that discovery to proceed. *See* A-569. Instead, the Bankruptcy Court ruled that it would first address the question of whether the Settlement Agreement was ambiguous as to the length of the joint monetization process. A-569 at lines 22–25.

On September 27, 2019, after the parties had briefed the issue of the Settlement Agreement's plain meaning, *see* A-577–603; A-604–18, and after hearing argument on the dispute, A-619–66, the Bankruptcy Court issued its ruling during a telephonic conference, A-3–19 ("Decision"). In the course of that ruling, the Bankruptcy Court acknowledged that, "[i]t may be that the parties intended the monetization process to conclude at the expiration of the 15-month window and for whatever reason the [Zohar Funds] and others have changed their minds." Decision at 14:23–15:1. Nevertheless, the Bankruptcy Court adopted the Zohar Funds' proffered interpretation, holding that "the settlement agreement unambiguously provides for the continuation of the monetization process following the expiration of the 15-month window." *Id.* at 9:6–8; *see also id.* at 15:14–16 ("[T]he terms of the Settlement Agreement are clear that the monetization process is to continue following the expiration of the 15-month window."). The Bankruptcy Court concluded that the mandatory joint monetization process under Paragraph 12 would not end until "one of two conditions occur: mutual agreement in writing to terminate the settlement agreement or the full-payment date," *id.* at 10:9–11, even though these conditions may

57772/0001-18123989v1

never be met.[9]  That same day, the Bankruptcy Court entered the Order that is the subject of this appeal, declaring that "[t]he Monetization Process for all Group A Portfolio Companies shall continue until terminated by mutual written agreement of the parties to the Settlement Agreement, such agreement to be granted or withheld in their respective sole discretion, or until the Full Payment Date."  Order at 2.[10]

On September 30, 2019, the Settlement Agreement's 15 Month Window expired and, with it, the provisions staying litigation and tolling the parties' causes of action.[11]  Accordingly, and consistent with the express of right of "all parties to the chapter 11 cases" to "exercise any and all rights available under applicable law" upon expiration of the 15 Month Window, Patriarch re-commenced certain actions and instituted new litigation as it deemed appropriate and necessary. Patriarch also timely noticed this appeal.  ECF 1.

---

[9]  As noted above, the Full Payment Date is not a date certain, but rather "[t]he date on which the parties or the classes of noteholders on Exhibit A [to the Settlement Agreement] are [p]aid in [f]ull," Settlement Agmt. at 1, which may never occur.

[10]  The Order does not purport to compel Ms. Tilton's specific performance of the purported joint monetization obligation under Paragraph 12—nor could it.  *See Dillman v. Chaffinch*, No. 02-509, 2003 WL 22415874, at *2 (D. Del. Oct. 2, 2003) ("In Delaware, as well as many other jurisdictions, it is a well-settled principle that performance of a contract for personal  services, even of a unique nature, will not be affirmatively and directly enforced.") (internal quotations omitted); *see also* A-624 at line 5 (Debtors' counsel, stating, "[w]e're not seeking specific performance").  But for the avoidance of doubt, Patriarch expressly reserves the right to challenge any attempt by the Zohar Funds (or any other party) to compel Ms. Tilton's specific performance under Paragraph 12, as well as any claim seeking damages.

[11]  The parties mutually agreed to extend the 15 Month Window, which was originally set to expire on August 21, 2019, until after the Bankruptcy Court issued a ruling on joint monetization dispute.  *See* A-260–61.

## ARGUMENT

I.  **The Bankruptcy Court Erred in Failing to Give Effect to the Entire Settlement Agreement, Expressly Incorporated by Paragraph 12, Which Unambiguously Limits the Joint Monetization Process to the Fifteen Month Window.**

Under Delaware law, "[t]he basic rule of contract construction gives priority to the intention of the parties." *E.I. du Pont*, 498 A.2d at 1113.[12]  "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *Id.*; *see also Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017) (A contract must be "read in full and situated in the commercial context between the parties."). "Contract language cannot be construed in a vacuum." *In re Cendant Corp. Sec. Litig.*, 181 F. App'x 206, 209 (3d Cir. 2006). "Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *In re Stone & Webster*, 558 F.3d at 234 (quoting *E.I. du Pont*, 498 A.2d at 1113). Here, the Bankruptcy Court's Order compelling continuation of a joint monetization process after expiration of the 15 Month Window "runs counter to" the Settlement Agreement's overall scheme and its component parts—as well as a proper reading of Paragraph 12 itself—and should be reversed. *E.I. du Pont*, 498 A.2d at 1114 (reversing erroneous interpretation of contract); *see also* A-591–94.

The deal at the heart of the Settlement Agreement—its purpose and intent, as reflected in its four corners—was to provide a 15-month reprieve from litigation and other activities antithetical to successful monetization so that the parties could work together during that "breathing spell" to monetize the Group A Portfolio Companies and maximize value for all stakeholders. *See supra* SOC Pt. III. Ms. Tilton would be temporarily obligated, during that 15

---

[12] The parties do not dispute, and the Bankruptcy Court agreed, that Delaware law governs interpretation of the Settlement Agreement. *See* Decision at 3:9–14.

Month Window, to work jointly with the CRO; and in exchange, the CRO would be able to participate in Group A Portfolio Company sales and refinancing in which the CRO (and Debtors) otherwise had no right to be involved. *See id.* Pts. I & III. That is why the Settlement Agreement time and again delineates the various respects in which the parties will return to the *status quo ante* upon expiration of the 15 Month Window (with limited exceptions not relevant here). It is in the context of, and with reference to, this overall scheme that the Settlement Agreement's constituent parts must be construed. *See, e.g., Chi. Bridge & Iron Co.*, 166 A.3d at 913–14. Indeed, the provision on which the Bankruptcy Court's Order is premised—Paragraph 12, which requires that Ms. Tilton and the CRO "work *jointly as outlined herein* to monetize the Group A Portfolio Companies" unless one of two conditions are met—"calls special attention to the cardinal rule that one paragraph in a contract, cannot be read in isolation, but must be read *within the context of the entire instrument*." *Hudson*, 252 A.2d at 169 (discussing the term "herein") (emphasis added); *see also D GYMS, LLC. v. Robino-Bay Court Plaza, LLC*, No. 3649, 2009 WL 196299, at *3 n. 17 (Del. Ch. Jan. 15, 2009) (citing *Hudson* approvingly and quoting same). Here, that includes expiration of the joint monetization process at the conclusion of the 15 Month Window.

The Bankruptcy Court contravened this canon of interpretation by divorcing the joint monetization process from the 15 Month Window to which it is deliberately and inextricably tied in the Settlement Agreement. It erroneously concluded that none of the provisions in the Settlement Agreement "limit the [joint monetization] process to the time period during the 15-Month Window," Decision at 9:19–23, while ignoring numerous provisions that do just that. For example:

- ***Paragraph 9*** guarantees that Ms. Tilton will remain in her positions at the helm of the Group A Portfolio Companies—a prerequisite to her ability to jointly monetize those companies—during the 15 Month Window *only*. *See* Settlement Agmt. ¶ 9. Now that

18

the 15 Month Window has expired, various parties may seek to remove Ms. Tilton from the Group A Portfolio Companies.

- ***Paragraphs 14, 15, and 19*** toll causes of action and stay value-destructive litigation among the parties during the 15 Month Window *only*—conditions that the parties recognized as an essential to joint monetization. *See supra* SOC Pts. III & IV. Lest there be any confusion as to whether the stay imposed by these paragraphs is tied to the joint monetization process, Paragraph 14 expressly links the two, providing that status quo orders affecting control of three Portfolio Companies will be held in abeyance "***during the 15 Month Window . . . with respect to the Monetization Process***." *Id.* ¶ 14 (emphasis added). Now that the 15 Month Window has expired, litigation is permitted to restart. *Id.* ¶¶ 14, 15, 19. Patriarch has already exercised its right to resume and commence litigation, and the other parties to the Settlement Agreement are free to do the same, with the CRO and Independent Director expressly authorized to pursue litigation concerning the Portfolio Companies' ownership and control. That litigation poses an existential threat to the joint monetization process, as the Zohar Funds' own Independent Director has recognized. *See infra* Arg. Pt. III.

- ***Paragraph 20*** requires that Ms. Tilton "first consult[] with the CRO" before taking certain actions on behalf of the Portfolio Companies, and that she operate the Portfolio Companies in the "ordinary course" during the 15 Month Window *only*. Now that the 15 Month Window has expired, Ms. Tilton is no longer obligated to consult with the CRO before taking certain actions—a fact that renders the prospect of a "joint" monetization process impracticable, to say the least. Instead, Ms. Tilton is authorized to take unilateral actions on behalf of the Portfolio Companies, including actions outside the ordinary course of business that may frustrate any prospect of joint monetization. *See id.* ¶ 20.

- ***Paragraph 6*** bars the Zohar Funds' administrative agent, during the 15 Month Window *only*, from taking certain actions against the Portfolio Companies that would impede their monetization. Now that the 15 Month Window has expired, the administrative agent may take various actions, such as declaring defaults by the Portfolio Companies or foreclosing upon those companies' assets, which would inhibit—or altogether preclude—their monetization. *Id.* ¶ 6.

Individually and together—including Paragraph 14's express reference to "the 15 Month Window . . . with respect to the Monetization Process"—these provisions leave no doubt that the joint monetization process is inextricably intertwined with, dependent on, and temporally limited to, the Settlement Agreement's 15 Month Window.

Paragraph 12 is no exception: When read in light of the Settlement Agreement as a whole and together with the provisions that Paragraph 12 expressly incorporates, it is clear that

19

Paragraph 12 sets out the limited circumstances in which the joint monetization process for the Group A Portfolio Companies may be terminated *during* the 15 Month Window, namely: (i) if the parties mutually agree to terminate the Settlement Agreement earlier, or (ii) if the noteholders are paid in full prior to that date. *See id.* ¶ 12. Moreover, the 15 Month Window's temporal limitation is clearly incorporated into Paragraph 12 when it sets out—before listing the conditions for early termination—the threshold constraint that Tilton and the CRO "shall work jointly *as outlined herein* to monetize the Group A Portfolio Companies." *Id.* (emphasis added). The Bankruptcy Court's contrary reading, which compels the continuation of the joint monetization process for the Group A Portfolio Companies indefinitely, even after expiration of the 15 Month Window, interprets Paragraph 12 in a manner that "runs counter to the agreement's overall scheme or plan." *E.I. du Pont*, 498 A.2d at 1113.

The Bankruptcy Court acknowledged that the parties "may" have "intended the monetization process to conclude at the expiration of the 15-month window and for whatever reason the [Zohar Funds] and other have changed their minds," Decision at 14:23–15:1, but ultimately concluded that, "[i]f the parties intended for the joint monetization process to end at the conclusion of the 15-month window, . . . they could have easily drafted Paragraph 12 to reflect such an intent," *id.* at 10:13–16. As set forth above, the parties *did* draft Paragraph 12 to reflect such an intent—specifically, to incorporate the 15 Month Window that is a fundamental feature of the agreement—by stating that Tilton and the CRO "shall work jointly *as outlined herein*." Settlement Agmt. ¶ 12 (emphasis added); *see also Hudson*, 252 A.2d at 169. And while the Bankruptcy Court offered alternative formulations of Paragraph 12 that, in its view, would have more clearly incorporated the 15 Month Window into that provision, *see* Decision at 10:13–25, that exercise does not in any way undermine that the joint monetization process is, in fact, limited

to the 15 Month Window under a proper reading of Paragraph 12 as it was written. *See In re Ryckman Creek Res., LLC*, No. 16-10292, 2018 WL 4178692, at *6 (Bankr. D. Del. Aug. 29, 2018) (adopting interpretation of provision notwithstanding argument that the parties "could have written" that provision more "clear[ly]" had they intended such a meaning) (alteration and ellipsis omitted). "Simply put, it is the court's job to interpret what is written, not to 'write it better.'" *Id.* The weight placed by the Bankruptcy Court on a hypothetical formulation of Paragraph 12 that, in its estimation, would have been more clear, is particularly problematic in light of its acknowledgement that the parties' mediation term sheet, which was subsequently approved as the Settlement Agreement, is as a whole "not a perfectly drafted document." Decision at 8:13–14.

The Bankruptcy Court agreed that Paragraph 12 mandates reference to other provisions in the Settlement Agreement. *See id.* at 12:22–13:5. However, it held that the phrase "as outlined herein" points only to those "provisions that describe the agreed-upon manner in which the [joint] monetization process will occur," *id.* at 12:22–13:5—a category that the Bankruptcy Court declined to define further, except to identify Paragraph 10 as one example—to the exclusion of temporal limitations on the joint monetization process. *Id.* That interpretation was erroneous and requires reversal.

First, there is no textual basis for the distinction drawn. The term "as outlined herein" is broad and unvariegated; it references each and every other part of the Settlement Agreement— "the entire instrument." *Hudson*, 252 A.2d at 169. If Paragraph 12 by its terms must be interpreted by reference to the entire agreement—and it must—then the Court erred in artificially excluding exactly those provisions that establish Patriarch's reading. Second, there is no principled substantive basis on which to distinguish between the provisions detailed above, which are essential components of the joint monetization process and are limited by the 15 Month Window,

and the provisions that the Bankruptcy Court deemed incorporated into Paragraph 12. *Compare* Decision at 13:3–5 (Paragraph 10 "discuss[es] information sharing, coordinating meetings, selecting professionals, and the like" between Ms. Tilton and the CRO), *with, e.g.*, Settlement Agmt. ¶ 20 (requiring Ms. Tilton's consultation with the CRO before taking certain actions during the 15 Month Window). That abridged reading of "as outlined herein" is untenable.

## II.     The Bankruptcy Court Erred in Interpreting the Settlement Agreement in a Manner that Nullifies Essential Terms of the Parties' Agreement.

It is a "cardinal rule" of Delaware contract interpretation that "all contract provisions [should] be harmonized and given effect where possible." *Martin Marietta*, 68 A.3d at 1225. Courts "will not read a contract to render a provision or term 'meaningless or illusory.'" *Osborn*, 991 A.2d at 1159 (internal citation omitted); *see also, e.g.*, *Sonitrol Holding Co.*, 607 A.2d at 1183 ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless."). Here, the Zohar Funds' erroneous interpretation of Paragraph 12—which the Bankruptcy Court adopted—effectively renders multiple key elements of the Settlement Agreement null and void. *See* A-594–95.

*First*, the Bankruptcy Court's interpretation guts Paragraph 25 of the Settlement Agreement by vitiating rights expressly granted therein. *See Del. Exp. Shuttle, Inc. v. Older*, No. 19596, 2002 WL 31458243, at *7 (Del. Ch. Oct. 23, 2002) (refusing to interpret a contractual provision in a manner which would "render [another provision] void"). There is no dispute that Ms. Tilton must retain "full authority on behalf of" the Group A Portfolio Companies, pursuant to Paragraph 10, if she is required to jointly monetize them. *See* Decision at 9:16–23 (interpreting Paragraph 10 as continuing beyond the 15 Month Window); *accord* A-639; A-612. Ms. Tilton cannot be removed from the Group A Portfolio Companies and stripped of that authority, as doing so would destroy any prospect of joint monetization. And yet, Paragraph 25 unambiguously

22

authorizes the CRO to "tak[e] action to remove [Ms.] Tilton as a director or manager of the Group A Portfolio Companies" "upon expiration of the 15 Month Window."  Settlement Agmt. ¶ 25 ("Upon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law.").  The Bankruptcy Court's interpretation thus depends upon—and necessarily compels—the non-exercise of rights that Paragraph 25 expressly grants.  Indeed, the Zohar Funds' Independent Director recognized the fundamental incompatibility of an ongoing joint monetization process with the exercise of rights granted under Paragraph 25 by representing that, if "the [Bankruptcy] Court were to adopt the Debtors' interpretation of the Settlement Agreement and allow the monetization process to continue," he would "seek a stay" of the very litigation that Paragraph 25 authorizes.  A-530.  This Court should therefore "decline[] to adopt an interpretation" of Paragraph 12 that "rob[s]" Paragraph 25 of its meaning.  *Martin Marietta*, 68 A.3d at 1221.

*Second*, the Bankruptcy Court's interpretation of Paragraph 12 renders meaningless the limited 15-month period for multiple other provisions in the Settlement Agreement.  *See Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 220 (D. Del. 2001) (refusing to adopt interpretation that would "read[] out" terms of other provisions).  As set forth above, the Order requires that Ms. Tilton continue working jointly to monetize Group A Portfolio Companies after expiration of the 15 Month Window, with full authority to act on their behalf.  *See supra* pp. 22–23.  But she cannot do so unless, pursuant to Paragraph 9, she "remain[s] in her position as director, manager and officer, as applicable, of the [those companies]," with all parties barred from "tak[ing] action to remove" her from those positions.  Settlement Agmt ¶ 9.  Accordingly, despite that the fact that Paragraph 9 is expressly limited to "the 15 Month Window," *id.*, it must be effectively extended concurrently with the ongoing joint monetization process that the Order requires in order for the

23

joint monetization process to proceed.  The same is true for the provisions that stay litigation seeking to wrest equity control and ownership of the Group A Portfolio Companies from Ms. Tilton during the 15 Month Window.  *See id.* ¶¶ 14, 15.  Although those provisions are by their plain terms limited to the 15 Month Window, the Bankruptcy Court's Order requires that they effectively remain in place indefinitely.

*Third*, the Bankruptcy Court's interpretation renders meaningless Paragraph 14's explicit reference to "*the 15 Month Window* or 18 Month Extended Window *with respect to the Monetization Process involving any Group A Portfolio Company*."  *Id.* ¶ 14 (emphasis added).  Interpreting the joint monetization process as proceeding independently from the Settlement Agreement's 15 Month Window, *see* Decision at 9:18–23, ignores Paragraph 14's unambiguous language linking the two.  Accordingly, the Bankruptcy Court erred in failing to "give[ ] effect" to—or even acknowledge—Paragraph 14's express language.  *See, e.g.*, *Martin Marietta*, 68 A.3d at 1225.

The Bankruptcy Court summarily concluded that it was "unable to identify any provision that would be rendered meaningless . . . if the monetization process continues," Decision at 14:3-5, but it failed to explain how the foregoing provisions could possibly be reconciled with its interpretation.  Instead, it erroneously concluded that "Paragraphs 10 and 3, in which the parties agreed to a joint monetization process of the Group B portfolio companies and when the parties would discuss such a process[,] would be rendered meaningless and nonsensical" by Patriarch's interpretation, *see id.* at 14:7–11, presumably because it misunderstood Patriarch's position to be that there can be no monetization process—even on a negotiated basis for Group B Portfolio Companies—after the expiration of the 15 Month Window.  But in point of fact, Paragraph 3 requires the parties to "negotiate in good faith on how to monetize the Group B Portfolio

57772/0001-18123989v1

Companies" if full payment has not occurred by the end of "the 15 Month Window," and it is therefore the Order extending the joint monetization process indefinitely that creates a conflict between Paragraphs 10 and 3. Specifically, the Bankruptcy Court determined that Paragraph 10, which refers to both the Group A *and* Group B Portfolio Companies, "describes the agreed-upon manner in which the monetization process will occur." Decision at 9:19–23, 13:1–3. If that is true, and Paragraph 10 were intended to survive beyond the 15 Month Window's expiration (as the Order requires and the Zohar Funds maintain), then there would be no need for the parties to "negotiate in good faith on how to monetize the Group B Portfolio Companies" at the end of the 15 Month Window, as Paragraph 3 requires, and no way to make sense of the latter provision. Instead, the parties would remain bound by Paragraph 10's monetization process.

In short, Patriarch's interpretation is the only way to "harmonize[ ] and give[ ] effect" to all of the Settlement Agreement's provisions. *Martin Marietta*, 68 A.3d at 1225.

### III.     The Bankruptcy Court Erred in Adopting an Interpretation of the Settlement Agreement that Produces Absurd Results.

"Delaware adheres to the 'objective' theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn*, 991 A.2d at 1159 (citation omitted). "An interpretation is unreasonable if it 'produces an absurd result or one that no reasonable person would have accepted when entering the contract.'" *AgroFresh*, 257 F. Supp. 3d at 656 (quoting *Osborn*, 991 A.2d at 1160) (declining "to accept an interpretation that would produce an absurd result"). In determining whether an interpretation produces an absurd result, courts do not merely analyze the current state of affairs; courts also consider the nonsensical outcomes that a given interpretation threatens to produce. *See, e.g.*, *Charney v. Am. Apparel, Inc.*, No. 11098, 2015 WL 5313769, at *13 (Del. Ch. Sept. 11, 2015) (considering hypothetical effect of proffered interpretation and rejecting that interpretation where it would

produce absurd result); *Miramar Police Officers' Ret. Plan v. Murdoch*, No. 9860, 2015 WL 1593745, at *9 (Del. Ch. Apr. 7, 2015) (considering hypothetical "[e]xamples . . . demonstrating the absurdity of [party's] argument"). Here, the Bankruptcy Court erred by adopting an interpretation of Paragraph 12 that produces patently absurd results that no reasonable person would have accepted—and which Patriarch did not accept—when negotiating the Settlement Agreement. *See* A-595–99.

*First*, "[i]t stretches the bounds of reason" to conclude that any person—let alone a sophisticated business woman with numerous other business ventures—would have agreed to participate in mandatory joint monetization efforts of indeterminate and potentially perpetual duration. *Osborn*, 991 A.2d at 1160–61 (holding that it was absurd to find that appellant "would sell her property for a mere pittance based on an undefined, unspecified, implicit term"). That conclusion is even more preposterous here, where the consideration for a potentially lifelong obligation—namely, the cessation of hostilities—was limited to a now-expired period of 15 months. The Bankruptcy Court concluded that its interpretation did not produce an absurd result because "Ms. Tilton's cooperation in the monetization process is not endless," as "[t]he clear terms indicate that it will end when the full-payment date is reached or the parties mutually agree to terminate the settlement agreement." Decision at 14:19–22. But it is indisputable (and Debtors do not dispute) that neither of the triggering events set out in Paragraph 12—full payment of certain stakeholders and an agreement by the parties to terminate the Settlement Agreement—is certain to occur. On the contrary, the joint monetization process appears unlikely to result in full payment, having already proved unsuccessful under circumstances that were designed to facilitate the process. *See* SOC Pts. III–V. And because the Settlement Agreement remains in place unless every party agrees in its "sole respective discretion" to terminate that agreement, Ms. Tilton's

release under the Order is at the mercy of the very parties to whom she is adverse and who are seeking indefinite continuation of the joint monetization process.  Settlement Agmt. ¶ 12.

*Second*, the Bankruptcy Court's Order illogically compels the joint monetization process to continue concurrent with value-destroying litigation that effectively frustrates any prospect of full repayment.  *See 2009 Caiola Family Trust*, 2014 WL 1813174, at *10–11 (rejecting interpretation that would produce "arguably absurd consequences" that would be "inconsistent with" the "framework" set forth in "other sections of the Agreement").  The purpose of the Settlement Agreement—as declared by the Zohar Funds when seeking the Bankruptcy Court's approval of the agreement and as reflected in the Settlement Agreement's overall structure—was to stay value-depressive litigation and other adverse actions so that the parties could engage in a joint process to monetize the Group A Portfolio Companies and maximize value for all Zohar Fund Stakeholders.  *See supra* SOC Pts. III & IV.  But even with a stay of litigation during the 15 Month Window, the joint monetization process proved "exceedingly difficult" and largely unsuccessful.  A-530.  No reasonable person would have agreed to extend that process without the concomitant stay—especially where that process requires Ms. Tilton to work with parties that have or may soon become adversaries once more.

Now that the stay and tolling provisions have expired, Ms. Tilton has resumed and initiated new litigation, as the Settlement Agreement authorizes her to do.  *See supra* SOC Pt. V; Arg. Pt. I. And while the CRO and Independent Director have not yet recommenced value-destructive litigation concerning ownership and control of the Group A Portfolio Companies, those actions are no longer barred by Settlement Agreement's stay provisions.  *See supra* SOC Pt. III; Arg. Pt. I. The Settlement Agreement should not be interpreted to embody an agreement between the parties to require joint monetization under these circumstances, where litigation among the parties has

resumed and the looming threat of value-destructive actions concerning the Group A Portfolio Companies precludes their successful joint monetization.[13]

Indeed, the Zohar Funds' Independent Director conceded the absurdity of this scenario when he told the Bankruptcy Court that he would "seek a stay of all internecine litigation between all Zohar Stakeholders over prepetition conduct" if the joint monetization process were required to continue, given that "the sales process ha[d] [already] proven exceedingly difficult without any distraction from litigation." A-530; *see also* A-560 at lines 2–7 (Independent Director would "not permit the litigation to begin and allow the monetization to go forward"). His counsel subsequently reiterated that point, acknowledging that the "litigation and chaos" unleashed upon expiration of the 15 Month Window would be "depressive on price." A-638 at lines 9–8. Notwithstanding these concessions, he took the position that a mandatory joint monetization process amidst value-depressive chaos should proceed because the Group A Portfolio Companies could be monetized through an indiscriminate process of "convert[ing] [them] to cash quickly and cheaply," A-638 at lines 3–5—*i.e.*, fire-sales—rather than through a process that "realizes the[ir] highest and best price," A-637 at lines 7–12; *cf. Toibb v. Radloff*, 501 U.S. 157, 163 (1991) (recognizing "general [Bankruptcy] Code policy of maximizing the value of the bankruptcy estate"); *In re Innkeepers USA Trust*, 442 B.R. 227, 235 (S.D.N.Y. 2010) (explaining that "it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties" to "maximize the value of the estate").

---

[13] The fact that other parties have not yet exercised their rights to pursue litigation does not make the interpretation endorsed by the Bankruptcy Court any less absurd. The question is not whether the present situation is absurd (it is), but whether a reasonable person would have agreed to terms of a contract that would foreseeably produce absurd results. *See Charney*, 2015 WL 5313769, at *13 ("[A] example" of the absurd results that a proffered interpretation could produce "m[ight] seem extreme, but from a legal perspective, it is not so different from the present situation.").

The Independent Director argued—and the Bankruptcy Court appears to have agreed, *see* Decision at 13:15–19—that so long as a joint monetization process following expiration of the 15 Month Window is *possible*, it is not absurd.  That argument misunderstands—and, in the Zohar Funds' case, misrepresents—the purpose of the Settlement Agreement and the relevant inquiry under Delaware law.  *See supra* SOC Pt. III; Arg. Pt. I; *see also* ECF 19, ¶ 15 (representing that the monetization process "embraces a *value-maximizing* . . . strategy to sell and/or refinance the Portfolio Companies") (emphasis added).  That the parties could, conceivably, attempt to jointly monetize Group  A Portfolio Companies under the cloud of value-depressive of litigation does not make an interpretation compelling such a result any less absurd.  The relevant inquiry is whether a "reasonable person would have accepted" this result "when entering the contract," *AgroFresh*, 257 F. Supp. 3d at 656 (quoting *Osborn*, 991 A.2d at 1159), and the undeniable answer to that question is "no."  Ms. Tilton owns the Zohar Funds and has an undisputed right to any remaining proceeds from sales of the Group A Portfolio Companies after noteholders and other stakeholders are paid.  *Supra* SOC Pt. I.  She has run the Group A Portfolio Companies for years, investing hundreds of millions of dollars and countless hours working to turn them around.  *See id*.  No reasonable person in Ms. Tilton's position would have agreed to sacrifice the long-term goal of maximizing their value, and instead permit a process in which she would be forced to allow them to be "quickly and cheaply" converted into cash under conditions that necessarily and dramatically reduce their value after 15 months.  The Order compelling this result should therefore be rejected as a matter of law.

IV.     **At the Very Least, the Settlement Agreement Is Ambiguous as to the Length of Ms. Tilton's Joint Monetization Obligation, in which Case this Court Should Vacate the Order and Remand for Further Proceedings.**

Patriarch maintains that the only reasonable interpretation of the Settlement Agreement, when read as a whole, is that it limits the mandatory joint monetization process for the Group A

Portfolio Companies to a period of 15 months.  At the very least, however, the Settlement Agreement is ambiguous, in which case this Court should vacate the Bankruptcy Court's Order and remand with instructions to permit the discovery sought by Patriarch and the consideration of extrinsic evidence concerning the parties' intent.  *See* A-598; *see also* A-582.

"When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity." *Salamone*, 106 A.3d at 374.  In fact, a contract may be ambiguous even where a proffered interpretation "seems strained" and a competing interpretation "seems more linguistically likely," as long as the court "cannot rule [either] out as a possible reading." *Sunline*, 206 A.3d at 848, 839.  For example, in *Sunline*, the Delaware Supreme Court reversed a lower court's contract interpretation and remanded that case for discovery where the appellant identified "conceivably conflicting terms" that could not be "indisputably reconciled." *See id.* at 839–40. Additionally, in *Coyne v. Fusion Healthworks, LLC*, No. 2018-0011, 2019 WL 1952990, at *8 (Del. Ch. Apr. 30, 2019), the Delaware Court of Chancery held that a contractual provision was ambiguous where one interpretation "fairly track[ed] the plain language of the provision" but "produce[d] a result that [was] arguably absurd."

Here, when Paragraph 12 is construed not merely in isolation but "in the context of the overall structure of the contract," as it must be, *Salamone*, 106 A.3d at 374, it is at the very least "susceptible [to the] reasonable interpretation" that the joint monetization process for the Group A Portfolio Companies is limited to a period of 15 months, *id.*  At a minimum, Patriarch has identified "conceivably conflicting terms" that "cannot be indisputably reconciled" without resort to extrinsic evidence, *Sunline*, 206 A.3d at 839–40, and patently absurd results that the Bankruptcy Court's interpretation produces, *see Coyne*, 2019 WL 1952990, at *8; *see supra* Arg. Pts. II & III.

The consideration of extrinsic evidence would be particularly appropriate here, where the meditation term sheet that became the parties' final "Settlement Agreement," *supra* SOC Pt. III, is indisputably "not a perfectly drafted document," as the Bankruptcy Court noted when interpreting the Settlement Agreement here.  Decision at 8:13–14.  As the Bankruptcy Court acknowledged, the Settlement Agreement suffers from "imperfections," including "at least two paragraphs that . . . necessitate follow-up negotiation and specifics," as well as "nonsubstantive scrivener errors."  *Id.* at 8:13–17.  And while the Bankruptcy Court reported that the "imperfections" did not affect its analysis as to the issue here, *id.* at 9:1–3, the Zohar Funds expressly relied on one of the paragraphs requiring "follow-up negotiation and specifics," *id*. 8:13–17, in their briefing below, *see* A-611.

Accordingly, at the very least, the Bankruptcy Court should have considered extrinsic evidence regarding the parties' intent before subjecting Ms. Tilton to an ongoing, potentially interminable, joint monetization obligation.  Although the Bankruptcy Court remarked that, "[i]t *may* be that the parties intended the monetization process to conclude at the expiration of the 15-month window and for whatever reason the debtors and others have changed their minds," Decision at 14:23–15:1 (emphasis added), the Zohar Funds' representations in prior court filings leave *no doubt* that they intended and understood the Settlement Agreement to set forth a "process to monetize the Debtors' assets over . . . 15 [] months," A-165; *accord* A-208 (referencing a "period of 15 months to monetize their assets"); *see also supra* SOC Pt. IV.  Accordingly, this Court should, at minimum, vacate the Bankruptcy Court's Order and remand for the development and consideration of extrinsic evidence.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellants respectfully request that this Court reverse the Order

or, alternatively, vacate the Order and remand with instructions to permit discovery and the

consideration of extrinsic evidence concerning the parties' intent.

Dated:  November 8, 2019

**COLE SCHOTZ P.C.**

By:___Patrick J. Reilley_____
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

– and –

**GIBSON, DUNN & CRUTCHER LLP**
Randy M. Mastro (admitted Pro Hac Vice)
Mary Beth Maloney (admitted Pro Hac Vice)
Akiva Shapiro (admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com
mmaloney@gibsondunn.com
ashapiro@gibsondunn.com

Robert Klyman (admitted Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-70520
rklyman@gibsondunn.com

Monica K. Loseman (admitted Pro Hac Vice)
1801 California Street, Suite 4200

32

Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

*Counsel to Appellants Lynn Tilton and the*
*Patriarch Stakeholders*

33

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. Bankr. P. 8015(h), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. Bankr. P. 8013(f)(3)(A).

1. Exclusive of the exempted portions of the brief specified in Fed. R. Bankr. P. 8015(g), the brief contains 10,658 words.

2. The brief has been prepared using Microsoft Word. The undersigned has relied upon the word count feature of this word processing software in preparing this certificate.

Dated: November 8, 2019

/s/ Patrick J. Reilley