IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE ZOHAR III, Corp., *et al.*, ) <br> ) <br> Debtors. ) | Chapter 11 <br> Case No. 18-10512 (KBO) <br> (Jointly Administered) |
| LYNN TILTON, *et al.*, ) <br> ) <br> Appellants, ) <br> ) <br> v. ) <br> ) <br> ZOHAR III, CORP., *et al.*, ) <br> ) <br> Appellees. ) | C.A. No. 19-1874 (MN) |

## MEMORANDUM ORDER

At Wilmington this 19th day of December 2019:

Before the Court is Appellants' Motion for Stay Pending Appeal (D.I. 4)[1] ("Stay Motion") filed by appellants, Lynn Tilton ("Tilton") and the Patriarch Stakeholders[2] (together, "Appellants") on October 15, 2019, seeking a stay pending appeal of the Bankruptcy Court's Order, entered on September 27, 2017 (B.D.I. 974) ("Order") in the Chapter 11 cases of appellees, Zohar III, Corporation and certain affiliates (together, "Debtors"). The Order requires the parties to continue their joint effort to monetize certain assets in accordance with a heavily negotiated, Bankruptcy Court ordered Mediation Term Sheet (B.D.I. 266), referred to in these Chapter 11 proceedings as the "Settlement Agreement." Also before the Court is Appellants' unopposed Motion to Expedite (D.I. 28) ("Motion to Expedite") this Court's consideration of the Stay Motion as well as the

---

[1] The docket of the Chapter 11 cases, captioned *In re Zohar III, Corp., et al.*, No. 18-10512 (KBO) (Bankr. D. Del.), is cited herein as "B.D.I. __."

[2] The Patriarch Stakeholders are the parties listed on Exhibit B to the Bankruptcy Court's Order adopting the Settlement Agreement (B.D.I. 266).

Court's consideration of the merits of the appeal. The Debtors have filed an opposition to the Stay Motion (D.I. 19), which is joined by intervenor and appellee MBIA Insurance Corporation (D.I. 20). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decision process would not be significantly aided by oral argument. For the reasons set forth below, the Stay Motion is DENIED, and the unopposed Motion to Expedite is GRANTED. Upon completion of merits briefing, which is currently scheduled to conclude on December 20, 2019 (D.I. 37), this appeal will be considered on an expedited basis.

1. **Background.** Debtors Zohar CDO 2003-1, Limited ("Zohar I"), Zohar II 2005-1, Limited ("Zohar II"), and Zohar III, Limited ("Zohar III") (collectively, "the Zohar Funds") are collateralized loan obligation funds created by Tilton. Funds raised by the Zohar Funds through note issuances were invested into operating companies ("the Portfolio Companies") evidenced by debt and equity instruments. Every quarter, Zohar Fund investors receive an interest payment financed by the collective payments the Zohar Funds receive from their loans to, and equity interests in, the Portfolio Companies.

2. The Portfolio Companies are primarily private, mid-sized companies and have been managed at the operational level by Tilton. Tilton's stated management strategy for the Zohar Funds included rehabilitating the Portfolio Companies, paying off their debt, and then selling them, with the proceeds of any increased equity value being applied to pay down the notes issued by the Zohar Funds.

3. On March 3, 2016, Alvarez & Marsal Zohar Management LLC ("AMZM") replaced Tilton-affiliated entities as the collateral manager for the Zohar Funds. The collateral manager was responsible for selecting and managing the investments made by the Zohar Funds in

the Portfolio Companies. Shortly after AMZM took over, divesting Tilton of her control over the Debtors' interests in the Portfolio Companies, Tilton argued the Zohar Funds' equity interests in the Portfolio Companies – memorialized in stock certificates and LLC Agreements naming the Zohar Funds as the holders of equity – did not actually belong to the Zohar Funds, but to Tilton and Tilton-controlled entities, and she had simply "gifted" to the Zohar Funds the "upside interest" in that equity.[3]

4. In November 2016, Zohar II and Zohar III commenced an expedited special proceeding in the Delaware Chancery Court ("225 Action"), seeking a determination that the Zohar Funds own the equity of three Portfolio Companies and have the power to name those companies' boards of directors – notwithstanding purportedly "irrevocable" proxies that Tilton granted herself shortly before exiting as Collateral Manager of the Zohar Funds. In November 2017, Vice Chancellor Slights issued a 96-page opinion, finding that the Zohar Funds were the legal and beneficial owners of the disputed shares and that Tilton's self-dealing proxies were invalid.[4]

5. Tilton appealed and obtained a stay of judgment. Tilton thus remained a director of the Portfolio Companies at issue throughout the appeal. On March 11, 2018 ("Petition Date"), nine days before oral argument before the Delaware Supreme Court, Tilton commenced the Debtors' chapter 11 cases. Tilton testified to the Bankruptcy Court that she was seeking "a mechanism to maximize value for all of the Zohar Funds' stakeholders and to protect the Portfolio Company constituents and monetize their considerable value,"[5] and the chapter 11 filing would

---

[3] *See* D.I. 19-2, Exh. C (B.D.I. 5) ("Tilton Decl.") ¶¶ 4, 95.

[4] *Zohar II 2005-1 Ltd. v. FSAR Holdings, Inc.*, 2017 WL 5956877 (Del. Ch. Nov. 30, 2017).

[5] Tilton Decl. ¶ 101.

still the "litigious environment [that] made it difficult to sell or refinance the Portfolio Companies, while maximizing their value."[6]

6. The Debtors' chapter 11 cases were contentious from the very outset, as various adversarial pleadings were filed. Among them, on March 26, 2018, MBIA and the Zohar III Controlling Class filed the Dismissal/Trustee Motion.[7] A trial was scheduled for April 17-18, 2018 to adjudicate the Litigated Contested Matters, and the parties devoted significant effort towards preparing for trial. On April 5, 2018, the Bankruptcy Court appointed Judge Gross ("Mediator") to mediate the parties' disputes (B.D.I. 143). Beginning on April 16, 2018, the day before trial, the parties engaged in mediation, which lasted four days and went late into each night. As a result of the good-faith mediation efforts overseen by the Mediator, the parties agreed to a comprehensive resolution of the Litigated Contested Matters, the terms of which are embodied in the Settlement Agreement.

7. On May 21, 2018, the Bankruptcy Court entered an Order approving the Settlement Agreement between (i) the Debtors, (ii) Tilton, (iii) Patriarch and its affiliates, (iv) MBIA, and (v) the Zohar III Controlling Class (B.D.I. 266) ("Settlement Order"). Also on May 21, 2018, the Bankruptcy Court entered an Order appointing retired Judge Joseph J. Farnan, Jr. as Independent Director (B.D.I. 266, 267) to replace Tilton as the Debtors' sole director. Further, pursuant to the Settlement Agreement, Michael Katzenstein was appointed as Chief Restructuring Officer ("CRO"), and Robert Kost was appointed as Chief Monetization Officer ("CMO") (B.D.I. 297, 298).

---

[6] Tilton Decl. ¶ 102.

[7] The filings described in this paragraph are the "Litigated Contested Matters."

8. It appears undisputed that a foundational element of the Settlement Agreement was the establishment of a monetization process to unlock the value of the Debtors' interests in the Portfolio Companies. Paragraph 10 of the Settlement Agreement establishes the general parameters of the process to monetize the Zohar Funds' interest in the Portfolio Companies, whether though sale or refinancing.[8] In recognition of the value-destructive litigation that loomed over the Portfolio Companies, the Settlement Agreement also provided for a 15-month armistice ("15-Month Window"). The 15-Month Window would have been extended if proceeds in the monetization process were generated to pay 50% of the amounts owed to the Zohar Funds' noteholders, an amount in excess of $800 million. Only two sales closed by the time the 15-Month Window expired on September 30, 2019, and the sales generated less than $200 million. Accordingly, the 15-Month Window was not extended beyond September 30, 2019.

9. Weeks before the scheduled expiration of the 15-Month Window, Tilton informed the Debtors that she believed the monetization process would terminate with the 15-Month Window's expiration. The Debtors disagreed, and the parties thereafter participated in a mediation session on July 31 with the Mediator to resolve the dispute. No resolution was reached, and in accordance with Paragraph 11 of the Settlement Agreement, the Debtors requested that the Bankruptcy Court resolve the dispute and confirm that the Settlement Agreement is unambiguous regarding the duration of the monetization process and the parties' obligations thereunder. The Debtors argued that the Agreement calls for the continuation of the monetization process following the 15-Month Window and directed the Bankruptcy Court's attention to Paragraphs 3, 10, and 12 of the Settlement Agreement. Debtors argued that Paragraph 10 establishes the parties' agreement for an independent director, CRO, and Tilton to conduct a joint process to monetize both the Group

---

[8] Settlement Agreement ¶¶ 10.

A portfolio companies and the Group B portfolio companies. Debtors argue that Paragraph 12 governs the duration of the monetization process. That section provides:

> Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies ***until such time as*** the [sic] **(i) *the parties each agree in writing to terminate*** this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or **(ii) *the Full Payment Date***.

(Settlement Agreement, ¶ 12) (emphasis added).

10. According to Debtors, the monetization process does not end when the 15-Month Window expires. Citing Paragraph 12, Debtors argued that the conclusion of the monetization process only occurs when the parties agree in writing to terminate the Settlement Agreement or on the Full Payment Date. Debtors further pointed to Paragraph 3, which provides that, if the full payment date does not occur within the 15-Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies. This provision, Debtors argued, clearly indicates that the parties anticipated the monetization process to continue after the 15-Month Window expires.

11. In opposition, Appellants argued, among other things, that the monetization process is precluded following the 15-Month Window because the Settlement Agreement would otherwise result in a litigious environment that may not yield the maximum value for the Portfolio Companies, that several provisions of the Settlement Agreement were inconsistent with one another, and that the Debtors' interpretation of the Settlement Agreement would lead to an absurd result.

12. On September 27, 2019, the Bankruptcy Court issued an oral ruling and the Order which is the subject of this appeal. (B.D.I. 972, 974). As set forth in the transcript, the question before the Bankruptcy Court was one of contract interpretation: "whether the terms of the

6

settlement agreement provide for termination or the continuation of the joint monetization process of the Group A portfolio companies at the conclusion of the 15-month window." (9/27/19 Hr'g Tr. at 3:9-145). The Bankruptcy Court identified the applicable standard:

> [T]here is no dispute that under Delaware's principles of contract interpretation, the threshold inquiry, when presented with a contract dispute is whether the language at issue in the context of the overall structure of the applicable contract is clear and unambiguous; in other words, does the language convey an unmistakable meaning? If it does, then the writing, itself, is the sole source for gaining [an] understanding of the contracting part[ies'] intent[,] and its language will control. Importantly, the fact that the parties dispute how to interpret the settlement agreement does not mean that it's ambiguous; rather, contracts are ambiguous when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. If reasonable minds [will] differ as to a contract's meaning, [there is] ambiguity, and, thus, a factual dispute results and the Court must consider admissible, extrinsic evidence to determine intent.

(*Id.* at 4:2-4:19). Here, each party argued that the Settlement Agreement was unambiguous but disputed how it must be interpreted. Based on a thorough review of the parties' arguments, the Bankruptcy Court did not find that the provisions in controversy were reasonably or fairly susceptible of different interpretations or may have two or more different meanings. The Bankruptcy Court rejected Appellants' main argument:

> While Ms. Tilton and the Patriarch stakeholders contend that the parties linked the monetization process to the 15-month window by using the phrase "as outlined herein" in Paragraph 12, ***the Court finds such an interpretation unreasonable***. That term is a dependent clause modifying the obligation of Ms. Tilton and the CRO to work jointly to monetize the Group A portfolio companies. And I agree with the debtors that the phrase points the reader to the provisions of the settlement agreement that describe the agreed upon manner in which the monetization process will occur, such as the agreements of Paragraph 10 that discuss information sharing, coordinating meetings, selecting professionals, and the like.

(9/27/19 Hr'g Tr. at 12:18-25; 13:1-5 (emphasis added)). The Bankruptcy Court further rejected Appellants' arguments that the Debtors' plain language reading of the Settlement Agreement was absurd, as it would force Tilton to work "in perpetuity" for "no compensation." (*See* D.I. 4 ¶¶ 3-4). The Bankruptcy Court noted that "there's no dispute that consideration was exchanged between the parties for the agreements embodied in the settlement agreement and Tilton's cooperation in this monetization process is not endless."[9] The Bankruptcy Court concluded that "[t]he plain terms and the clear limits that are set forth in the settlement agreement demonstrate to the Court that the parties did not intend for the monetization process to end at the conclusion of the 15-month window." (*Id*. at 10:13-25).

13. Following the Bankruptcy Court's bench ruling, Appellants made an oral motion for stay pending appeal, which was denied by the Bankruptcy Court. The Order was entered the same day, on September 27, 2019. Thereafter, Appellants filed a timely appeal on October 4, 2019 (D.I. 1). On October 15, 2019, Appellants filed the Stay Motion in this Court. On November 1, 2019, Appellants filed the unopposed Motion to Expedite. The Stay Motion is fully briefed. (D.I. 4, 5, 19, 20, 32).

14. **Jurisdiction.** Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1).

15. **Discussion.** "The granting of a motion for stay pending appeal is discretionary with the court." *In re Trans World Airlines, Inc*., 2001 WL 1820325, at *2-3 (Bankr. D. Del. Mar. 27, 2001). Appellants bear the burden of proving that a stay of the Order is warranted based on the following criteria: (1) whether the movant has made "a strong showing" that it is likely to

---

[9] 9/27/19 Ruling Tr. at 14:12-22.

succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether a stay will substantially injure other interested parties; and (4) where the public interest lies. *Republic of Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). The most critical factors, according to the Supreme Court, are the first two: whether the stay movant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm – the latter referring to harm that cannot be prevented or fully rectified by a successful appeal. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009). The Court's analysis should proceed as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) [it] will suffer irreparable harm absent a stay? If it has, we balance the relative harms considering all four factors using a 'sliding scale' approach. However, if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.

*Revel AC*, 802 F.3d at 571 (emphasis in text) (internal quotations and citations omitted).

16. ***Likelihood of success on the merits.*** As to the first factor, Appellants argue that they are likely to succeed in showing that the Bankruptcy Court erred in holding that the Settlement Agreement unambiguously extends the joint monetization process beyond the 15-Month Window. While the Bankruptcy Court acknowledged that the parties "may [have] intended the monetization process to conclude at the expiration of the 15-month window," Appellants argue that the Bankruptcy Court erroneously interpreted the "language used" to reach the opposite conclusion. (9/27/19 Hr'g Tr. at 14:23-15:2). At the very least, Appellants argue, the Settlement Agreement is ambiguous as to the length of the joint monetization period, such that this Court should vacate the Order and remand to allow the discovery sought by Appellants and the consideration of extrinsic evidence of the parties' intent. (D.I. 4 at 3-4). Debtors argue that Appellants are not

9

likely to prevail on this argument because the Settlement Agreement is unambiguous, and Appellants have failed to identify any words in the Settlement Agreement that contradict the clear language of Paragraph 12.

17. The Court finds that Appellants are unlikely to successfully argue that the Settlement Agreement unambiguously provides for termination of the monetization process at expiration of the 15-Month Window. The expiration of the monetization process is expressly addressed by Paragraph 12 of the Settlement Agreement, which provides: "Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the [*sic*] ***(i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date.***" As the Bankruptcy Court noted, "The []phrase 'until such time' could not be clearer. The monetization process ends when one of two conditions occur: mutual agreement in writing to terminate the settlement agreement or the full-payment date." (9/27/19 Hr'g Tr. 10:8-12). Appellants have not provided any credible justification for why the parties to the Settlement Agreement would have neglected to specifically reference the expiration of the 15-Month Window in Paragraph 12 if they intended it to be a third condition under which the Monetization Process would terminate.

18. As the Bankruptcy Court explained, "The parties to the settlement agreement used two key defined terms . . . to establish temporal limitations on the agreements set forth therein: 'the 15-month window' and the 'full-payment date.'" (9/27/19 Hr'g Tr. at 11:14-21). "Using these terms created two distinct buckets of agreements: those that expire at the full-payment date and those that expire at the end of the 15-month window." (*Id*. at 11:18-21). "The parties clearly

knew how to make certain agreements contingent on the 15-month window and they did not do so, with respect to the monetization process." (*Id*. at 11:11-12:17).

19. Appellants argue that the Bankruptcy Court "gave effect to only a handful of words in the Settlement Agreement while ignoring its overall structure," erroneously read Paragraph 12 "in isolation," and failed to consider the Settlement Agreement "as a whole." (D.I. 4 at 10-13). The substance of the Bankruptcy Court's detailed ruling contradicts Appellants' argument that the Bankruptcy Court failed to read the Settlement Agreement as a whole. The Bankruptcy Court specifically considered and rejected Appellants' argument that the parties linked the monetization process to the 15-Month Window by using the phrase "as outlined herein" in Paragraph 12, finding that the phrase points to the provisions of the Settlement Agreement that describe the agreed upon manner in which the monetization process will occur, such as the agreements of Paragraph 10 that discuss information sharing, coordinating meetings, and selecting professionals. (*See id*. at 12:18-13:5). As the Bankruptcy Court further noted, the expression of one thing is the exclusion of the other. (*See id*. at 13:6-11).

20. As for Appellants' arguments that any interpretation allowing the monetization process to continue following the 15-Month Window would render other provisions of the Settlement Agreement meaningless or nonsensical, the Bankruptcy Court was unable to identify any such provisions, and the Court finds Appellants unlikely to succeed with respect to the provisions they have identified in the Stay Motion. (*See id*. at 13:12-14:11). Appellants argue that forcing Tilton to participate in the monetization process following the 15-Month Window, when the threat of litigation resumes, is nonsensical because it "forces warring parties to engage in a joint monetization process under conditions that cannot succeed." (D.I. 4 at 1). Appellants argue that any monetization efforts conducted under these circumstances are doomed to fail or result in

11

sales prices far below the Portfolio Companies' actual value. (*Id.* at 13 (citing Tilton Decl. ¶¶ 15–16)). The Court agrees with Debtors that, even if the parties agreed to stay litigation during the 15-Month Window to preserve value of the portfolio companies and to avoid distraction from the monetization process, Appellants have not explained why it is absurd that the process should continue following the 15-Month Window. (*See* D.I. 19 at 8-11). Indeed, by *not* tethering the expiration of the 15-Month Window to the expiration of the Monetization Process, the parties were incentivized to efficiently monetize the Portfolio Companies. Finally, Appellants argue that it is likely to prevail on appeal because the Bankruptcy Court's reading renders Tilton an "indentured servant" forced to work "in perpetuity" for "no compensation." However, it is undisputed that consideration was given to Tilton under the Settlement Agreement, including a 15-month stay of litigation, and the Court finds that it is unlikely that Appellants will demonstrate on appeal that requiring Tilton to participate in the joint monetization process following the litigation stay in accordance with express terms of the Settlement Agreement is an absurd result. Appellants have not met their burden of making "a strong showing" that they are likely to succeed on appeal with respect to any the errors alleged.

21. ***Irreparable harm to Appellants absent a stay.*** To establish that they will suffer irreparable harm in the absence of a stay, Appellants must establish a resulting injury "that cannot be redressed by a legal or equitable remedy." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Appellants claim that the Bankruptcy Court's enforcement of the monetization process irreparably harms Tilton by requiring her to work jointly with the CRO "for a *potentially* interminable period of time." (D.I. 4 at 13-15). However, the monetization process is not interminable, as the Settlement Agreement explicitly provides two instances under which the Monetization Process will end. (Settlement Agreement ¶ 12). Moreover, the

Bankruptcy Court has held that "[t]o constitute irreparable harm . . . an injury *cannot be speculative*, it must be *certain*, great, and *actual*." *In re ANC Rental Corp.*, No. 01-11220 (MFW), 2002 WL 1058196, at *2 (D. Del. May 22, 2002) (emphasis added). Tilton's claim that the joint monetization process is potentially interminable is a speculative harm that does not amount to irreparable harm.

22. Appellants' argument that requiring Tilton's further participation in the ongoing monetization process poses irreparable harm in the form of her time and energy is belied by Appellants' contentions that "Tilton is a rational businesswoman who has invested years of her life and hundreds of millions of dollars turning these Portfolio Companies around and has a significant financial stake in their success" and that she "will devote herself to the Group A Portfolio Companies regardless" of the stay. (*See* D.I. 4 at 16 (citing Tilton Decl. ¶¶ 1-5)). In such case, any harm that would result in the absence of a stay of the Order requiring Tilton's continued participation can hardly be characterized as irreparable. (*Id.* at 15).

23. Having evaluated Appellants' likelihood of success on the merits and irreparable injury absent a stay, and having determined that Appellants have failed to carry their burden as to either element, no further analysis is required. *See Revel AC*, 802 F.3d at 571 ("If the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis."). However, the Court finds that the remaining factors further weigh against granting the Stay Motion.

24. ***Balance of the harms***. According to Appellants, the balance of the harms favors granting the stay pending appeal. (D.I. 4 at 15). Appellants simply argue that a stay would only last for the brief duration of this appeal, preventing the stay from burdening other parties. (*See id.*)

Conversely, the Debtors argue that any delays in the Portfolio Companies' monetization can only harm their value. (D.I. 19 at 14-15). According to the Debtors, the Chapter 11 cases were commenced specifically so that "stakeholders can finally access the full value of the cash flows from Portfolio Companies sales or refinancings, which has been locked, for many years, as a result of the ongoing litigations with MBIA and AMZM."[10] Debtors argue that the monetization process offers the last best chance to maximize the Zohar Funds' assets for the benefit of all stakeholders, and "Tilton's abandonment of that joint process would thus defeat the whole purpose of the Debtors' chapter 11 cases." (*Id*. at 19). Debtors further argue that Appellants' recent argument that a stay pending appeal would present no harm to Debtors is belied by Tilton's previous declarations and statements in the Chapter 11 cases. (*See* D.I. 19 at 14-15). "Tilton has repeatedly warned that time is of the essence in monetizing the Portfolio Companies. At a hearing to consider Tilton's request for expedited discovery regarding the Settlement Agreement, her counsel repeatedly stated that 'delay is no one's friend' and stressed that 'it's these portfolio companies that we have to care so much about and the time pressure on them.'" (D.I. 19-2, Exh. G, 9/5/19 Hr'g Tr. 13:22-23, 13:25-14:1 14:23).

25. The record clearly supports the Debtors' concern that time is of the essence in monetizing the Portfolio Companies, including Appellants' own statements. The Court agrees with Debtors that, when comparing the harm, if any, that Appellants might suffer if there is no stay to the cognizable and significant injury that the Debtors and their creditors would suffer if there is a stay, the scale tips in favor of the Debtors. If there is no stay pending appeal, the parties may simply continue to jointly monetize the Portfolio Companies in compliance with the terms of the

---

[10] Tilton Decl. ¶ 139

Settlement Agreement. On the other hand, if a stay is granted, the Portfolio Companies may continue to lose value during the pendency of the appeal.

26. ***Public interest.*** Debtors argue that the public interest is not served by allowing parties to a heavily-negotiated, court-sanctioned agreement to avoid their obligations and undermine such agreements. Rather, "[t]he public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense." (D.I. 19 at 15-16). Debtors further argue that recent developments further militate against staying the Order pending appeal. (*See id.* at 15-16). While Appellants argue that the public interest favors granting the stay "because it would help stabilize the Group A Portfolio Companies, which are not themselves in bankruptcy," (D.I. 4 at 15), Debtors point out that quite recently "one of the most valuable Group A Portfolio Companies is in bankruptcy (or, more aptly stated, forced into bankruptcy by Tilton), and setting precedent for other Portfolio Company bankruptcies."[11] (*Id*. at 16). Debtors argue that Dura Automotive recently commenced chapter 11 proceedings in Tennessee to sell its assets to a Tilton-controlled entity at a valuation that would provide no recovery on the Debtors' secured loans and interests.[12] Debtors argue that these recent events demonstrate that Appellants want to delay or abandon the monetization process precisely because it requires Tilton to work jointly with the Debtors to monetize the Portfolio Companies for the benefit of all stakeholders, rather than just Tilton herself, and "[a]s Tilton is already wantonly disregarding this joint process, no stay is even needed." (*Id*. at 2).

---

[11] The Court may take judicial notice of the filing in the *Dura Automotive* bankruptcy. *See* FED. R. EVID. 201; *see also* 21B FED. PRAC. & PROC. EVID. § 5110.1 (2d ed.) ("Judicial notice seems to be favored when the appellate court needs to take account of developments in the case subsequent to proceedings in the trial court.").

[12] *See* D.I. 19-2, Exh. D ("Grady Decl."), ¶ 54.

15

27. Assuming the Debtors' statements are unjustified, the public interest factor clearly weighs against staying the Order and halting the joint monetization process in this particular case. The fundamental purpose of a stay pending appeal is the preservation of the status quo. *See e.g.*, *In re W.R. Grace & Co.*, No. 01-1139, 2008 WL 5978951, at *6 (D. Del. Oct. 28, 2008) ("Generally, motions to stay do not impinge upon appellate court review but rather assist 'in maintaining the true status quo pending appeal.'") (quoting *Sansom Cmte. v. Tr. of the Univ. Pa.*, 735 F.2d 1552, 1554 (3d Cir.1984)). Here, if no stay is imposed, the parties can jointly continue the monetization process put into place more than eighteen months ago. The Court agrees with Debtors that the public interest factor favors the Debtors as they ultimately seek to preserve the status quo and monetize the assets, which are losing value, to the extent possible during the pendency of the appeal.

28. **Conclusion.** The Bankruptcy Court's ruling is consistent with Delaware's principles of contract interpretation, as the language at issue in the Settlement Agreement conveys an unmistakable meaning, and Appellants have failed to cite language that would contradict the plain language of Paragraph 12 of the Settlement Agreement governing the duration of the joint monetization process for the Group A Portfolio Companies. Appellants have also failed to establish that they will suffer irreparable harm in absence of a stay, and the remaining factors weigh against granting Appellants the relief sought.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Stay Motion (D.I. 4) is DENIED, and the unopposed Motion to Expedite (D.I. 28) is GRANTED.

_____
The Honorable Maryellen Noreika
United States District Judge