IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE ZOHAR III, Corp., *et al.*, | ) | Chapter 11 |
| | ) | Case No. 18-10512 (KBO) |
| Debtors. | ) | (Jointly Administered) |
| LYNN TILTON, *et al.*, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-1874 (MN) |
| | ) | |
| ZOHAR III, CORP., *et al.*, | ) | |
| | ) | |
| Appellees. | ) | |

## <u>MEMORANDUM OPINION</u>

Norman L. Pernick, G. David Dean, Patrick J. Reilley, COLE SCHOTZ, P.C., Wilmington, DE; Randy M. Mastro, Mary Beth Maloney, Akiva Shapiro, GIBSON, DUNN & CRUTCHER LLP, New York, NY; Robert Klyman, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, CA; Monica K. Loseman, GIBSON, DUNN & CRUTCHER LLP, Denver, CO – Attorneys for the Appellants for Appellants Lynn Tilton and the Patriarch Stakeholders.

James L. Patton, Jr. Robert S. Brady, Michael R. Nestor, Joseph M. Barry, Ryan M. Bartley, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE – Attorneys for Debtors-Appellees.

July 13, 2020

**NOREIKA, U.S. District Judge**

Pending before the Court is an appeal by Lynn Tilton and the Patriarch Stakeholders[1] (together, "Appellants") of the Bankruptcy Court's September 27, 2019 Order (B.D.I. 974) ("Order") in the Chapter 11 cases of appellees, Zohar III, Corporation and certain affiliates (together, "Zohar Funds" or "Debtors").   The Order granted the Debtors' motion to compel Ms. Tilton to continue with a monetization process agreed to by the parties in accordance with a settlement agreement approved by the Bankruptcy Court (B.D.I. 266-1 (A126)) ("Settlement Agreement").  The Settlement Agreement was intended to provide a 15-month breathing spell from value-destructive litigation so that these adversarial parties could work together to try to monetize certain companies and maximize value for all stakeholders.   Appellants contend that upon expiration of the 15-month window, however, the Settlement Agreement contemplated restoring the parties to the *status quo ante* – permitting litigation to resume and ending the monetization process.  The Bankruptcy Court disagreed, holding that "the settlement agreement unambiguously provides for the continuation of the [joint] monetization process following the expiration of the 15-month window."[2]  For the reasons set forth below, the Order is affirmed.

## I.      BACKGROUND

Ms. Tilton created and founded the Zohar Funds, which were distressed debt collateralized loan obligations ("CLOs"), originally sponsored over 10 years ago.  (A23-A24).  The Zohar Funds' assets are primarily loans to distressed companies ("Portfolio Companies").  The Zohar Funds used

---

[1]      The docket of the Chapter 11 cases, captioned *In re Zohar III, Corp., et al.*, No. 18-10512 (KBO), is cited herein as "B.D.I. __."   The appendix (D.I. 39) filed in support of Appellants' opening brief (D.I. 38) is cited herein as "A__."  The Patriarch Stakeholders are the parties listed on Exhibit B to the Bankruptcy Court's Order adopting the Settlement Agreement.  (A139).

[2]      *See* A3-A19, 9/27/19 Hr'g Tr. at 9:4-8.

the capital raised from issuing notes to their investors – approximately $2.5 billion in the aggregate – to make debt or equity investments that serve as the collateral for repayment of the secured notes. (A22–A23; A33-A34).  From the Zohar Funds' inception to present, Ms. Tilton has remained their sole owner, through entities she owns (directly or ultimately).  (A22).  Through other investment vehicles she manages, Ms. Tilton also invested in certain of the Portfolio Companies alongside the Zohar Funds.  (A30).  Every quarter, the Zohar Funds' investors would receive an interest payment generated from the collective payments made by the operating companies in the Zohar Funds' investment portfolio.  (A22-A23).  The Portfolio Companies are primarily private companies. (A23).

MBIA Insurance Corp. ("MBIA") insured Zohar I's and Zohar II's obligations to their senior noteholders.  (A34-A35).  Consequently, MBIA is the "Controlling Party" for Zohar I and Zohar II under the terms of their indentures.  (A53).  As the Controlling Party, MBIA had the ability to direct certain limited actions on behalf of Zohar I and Zohar II, particularly following an event of default under the indentures.  (A53).  MBIA did not insure Zohar III.  Zohar III has a "Controlling Class" consisting of various private investors who hold more than 50% of the aggregate outstanding amount of Zohar III's senior notes ("the Zohar III Controlling Class"). (D.I. 38 at 8; A56; A88; A335).

Ms. Tilton has taken the position that the Zohar Funds' equity interests in the Portfolio Companies ("Zohar Equity") – memorialized in stock certificates and LLC Agreements naming the Zohar Funds as the holders of equity – did not belong to the Zohar Funds, but to Ms. Tilton and Tilton-controlled entities, and she had simply "gifted" to the Zohar Funds the "upside interest" in that equity.  (A46).  Ms. Tilton's and the Zohar Funds' competing claims to ownership and control of the Zohar Entities were the subject of extensive litigation before Ms. Tilton decided to commence the Debtors' chapter 11 cases.  (D.I. 38 at 8; A47-A49; A88).  Most of those cases were

2

still pending at the time of the bankruptcy filing.  (D.I. 38 at 8).  Among those cases were numerous

actions seeking declarations as to which party properly controls and beneficially owns the Portfolio

Companies.[3]  (*Id*.).  The disputes over ownership and control of the Zohar Equity appear to be

between Ms. Tilton (and her intermediate holding entities) and the Zohar Funds.[4]

At the time of this appeal, Ms. Tilton, had been and currently remained actively involved

in the management of the Portfolio Companies.  (D.I. 38 at 7-8; A23-A24).  She served as CEO

for certain Portfolio Companies and was a board member or manager of each Portfolio Company

(and, in most cases, the sole board member or manager).  (D.I. 38 at 8).  Ms. Tilton has also

personally invested in and loan hundreds of millions of dollars to the Portfolio Companies.  (A30).

Through her ownership and control of the Portfolio Companies, she has implemented long-term

turnaround plans, and over the years, she has successfully revitalized and sold a number of

companies.  (A23; A38-A45).  Because the Portfolio Companies have been mired in litigation,

however, the "litigious environment," according to Ms. Tilton, "made it difficult to sell or

refinance the Portfolio Companies, while maximizing their value," in order to repay the Zohar

Funds' creditors, namely MBIA and the Zohar III noteholders.  (A49).  The litigation cast a cloud

---

[3]     *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.,* No. 12946-VCS (Del. Ch.) ("the
        Delaware 225 Action"); *Zohar CDO 2003-1, Ltd. et al. v. Patriarch Partners, LLC et al*.,
        No. 1:17-cv-00307-WHP (S.D.N.Y*.); Tilton v. Zohar CDO 2003-1, Ltd*., No. CV-02017-
        013549 (Ariz. Sup. Ct.); *Tilton et al. v. Zohar III, Ltd., et al*., No. BC683129 (Cal. Sup.
        Ct.); *Tilton et al. v. Zohar CDO 2003, Ltd. et al*., No. 17-016240-CB (Mich. Cir. Ct.);
        *Zohar CDO 2003-1, Ltd. et al. v. Croscill Home et al.,* No. 1:17-cv-01797-JFB-SRF
        (D. Del.); *Zohar CDO 2003-1, Ltd. et al. v. Octaluna LLC et al*., No. 1:18-cv-00108-JFB-
        SRF (D. Del.).

[4]     According to the Settlement Agreement, MBIA purchased certain assets of Zohar I at a
        judicially supervised auction.  Thus, there is an ancillary dispute about whether the assets
        MBIA purchased included Zohar Equity recorded in the name of Zohar I, but that dispute
        is ultimately rooted in the question of whether Zohar I or Ms. Tilton was the beneficial
        owner of the Zohar Equity at issue.

of uncertainty over the Portfolio Companies, rendering them unable to obtain critical financing and stalling negotiations with potential buyers and lenders.  (A24-A25).

### B.    Chapter 11 Cases

On March 11, 2018 ("Petition Date"), Ms. Tilton caused the Zohar Funds to file voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("the Bankruptcy Code"), which resulted in the imposition of the automatic stay under § 362 of the Bankruptcy Code. 11 U.S.C. § 362.  The bankruptcy was intended to still the litigious environment that made it difficult to sell or refinance the Portfolio Companies and to "provide the Zohar Fund stakeholders with an opportunity to find a mutually agreeable path forward in unlocking and maximizing the value of the Zohar Funds' assets."  (D.I. 38 at 9; *see* A25; A83).

Unfortunately, the chapter 11 filing did not still the litigious environment.  The Debtors' chapter 11 cases were contentious from the very outset, as various adversarial pleadings were filed. (*See* A88-A89 (summarizing the various disputes)).  Among them, MBIA and the Zohar III Controlling Class filed a series of  motions seeking to dismiss the cases or, alternatively, to appoint a chapter 11 trustee for the Zohar Funds.  (A225).  A trial was scheduled for April 17-18, 2018 to adjudicate certain of these matters, and the parties devoted significant effort towards preparing for trial.  On April 5, 2018, the Bankruptcy Court appointed Judge Gross ("Mediator") to mediate the various contested matters.  (B.D.I. 143).  Beginning on April 16, 2018, the day before trial, the parties engaged in mediation, which lasted four days and went late into each night.  As a result of the good-faith mediation efforts overseen by the Mediator, the parties agreed to a comprehensive resolution of the contested matters, the terms of which are embodied in the Settlement Agreement.

## C.     Settlement Agreement

On May 21, 2018, the Bankruptcy Court entered an order approving the Settlement Agreement between (i) the Debtors, (ii) Ms. Tilton, (iii) Patriarch and its affiliates, (iv) MBIA, and (v) the Zohar III Controlling Class (B.D.I. 266) ("the Settlement Order").  (A122-A144).  The Settlement Agreement was Exhibit A to the Order.  (B.D.I. 266-1 (A126)).  Also on May 21, 2018, the Bankruptcy Court entered an order appointing retired judge Joseph J. Farnan, Jr. as Independent Director (B.D.I. 266, 267) to replace Ms. Tilton as the Debtors' sole director.  Further, pursuant to the Settlement Agreement, Michael Katzenstein was appointed as Chief Restructuring Officer ("CRO"), and Robert Kost was appointed as Chief Monetization Officer ("CMO") (B.D.I. 297, 298).

A foundational element of the Settlement Agreement was the establishment of a monetization process in which the two parties claiming ownership of the Zohar Equity – Ms. Tilton and the Zohar Funds – would work jointly to monetize the Portfolio Companies for the benefit of all of the Zohar Funds' stakeholders.  (*See* Settlement Agreement ¶¶ 8, 10-12 (A130-A131)).  Paragraph 10 of the Settlement Agreement establishes the general parameters of the monetization process.  (*See id.* ¶ 10 (A130-A131)).  Paragraph 11 provides for the mediation, and resolution by the Bankruptcy Court if necessary, of "[a]ny dispute with respect to the Monetization Process" that arises between the two joint participants in that process, the Zohar Funds (represented by their Independent Director and CRO) and Ms. Tilton.  (*See id*. ¶ 11 (A131)).  Paragraph 12 provides that Ms. Tilton and the Zohar Funds shall continue to work jointly to monetize the "Group A" Portfolio Companies as outlined in the Settlement Agreement "until such time as" the parties mutually agree to terminate the Settlement Agreement or the Zohar Funds pay their noteholders in full.  (*See id.* ¶ 12 (A131)).  Under the Settlement Agreement, the "Paid in Full Amount" was more

than $976,961,211 for MBIA and more than $798,870,573 for the Zohar III noteholders, for a total of more than $1.7 billion.  (*See id*. at Ex. A (A128, A136–A138)).

In recognition of the value-destructive litigation that loomed over the Portfolio Companies, the Settlement Agreement also provided for a litigation armistice for a period of 15 months ("15-Month Window") to allow the parties an opportunity to monetize the Portfolio Companies without litigation occurring in the background.  (Settlement Agreement ¶¶ 14, 15, 19).  The Settlement Agreement further provided that, if the Zohar Funds' noteholders received 50% of the amounts owed to them (more than $880 million) before the expiration of the 15-Month Window, the litigation armistice would automatically extend for another three months.  (*Id.* ¶ 29).  When the 15-Month Window expired, however, only two sales had closed, generating less than $200 million.  Accordingly, the litigation armistice concluded on September 30, 2019.

Weeks before the scheduled expiration of the 15-Month Window, the parties realized there was a disagreement as to what would happen at its expiration.  Ms. Tilton informed the Debtors that she believed the expiration of the 15-Month Window would also terminate the monetization process.  Appellants argued, among other things, that the monetization process is precluded following the 15-Month Window because the Settlement Agreement would otherwise result in a litigious environment that may not yield the maximum value for the Portfolio Companies, and further that the Debtors' interpretation of the Settlement Agreement would lead to an absurd result. The Debtors took the position that Paragraph 12 governs the duration of the monetization process. That section provides:

> Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies ***until such time as*** the [sic] **(i)** ***the parties each agree in writing to terminate*** this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or **(ii)** ***the Full Payment Date***.

(Settlement Agreement, ¶ 12 (emphasis added)).  Citing Paragraph 12, the Debtors argued that the conclusion of the monetization process only occurs when the parties agree in writing to terminate the Settlement Agreement or on the Full Payment Date.[5]  The Debtors further pointed to Paragraph 3, which provides that, if the full payment date does not occur within the 15-Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the "Group B" Portfolio Companies.  This provision, Debtors argued, indicates that the parties anticipated the monetization process to continue after the 15-Month Window expires.

Unable to reach an agreement, the parties participated in a mediation session on July 31, 2019 with the Mediator to resolve the dispute.  Mediation proved fruitless, and, in accordance with Paragraph 11 of the Settlement Agreement, the Debtors requested that the Bankruptcy Court resolve the dispute and confirm that the Settlement Agreement is unambiguous regarding the duration of the Monetization Process.  On August 7, 2019, the Zohar Funds filed with the Bankruptcy Court a motion seeking to compel Ms. Tilton to continue the monetization process until the parties mutually agreed to terminate the Settlement Agreement or the Zohar Funds' noteholders were repaid in full.  (*See* A222–A259).

In response to that motion, Appellants sought discovery to confirm the parties' intent and understanding that the monetization process would cease upon expiration of the 15-Month Window.  (*See* A262–A286; A308–A525; A577-A603).  The Zohar Funds did not agree to discovery, and the Bankruptcy Court ruled that it would first address the question of whether the Settlement Agreement was ambiguous as to the length of the monetization process.  (A569).

---

[5]     The Settlement Agreement defines "Full Payment Date" as "[t]he date on which the parties or the classes of noteholders on Exhibit A [listing the Zohar III Claims] are Paid in Full." (A127).  "Paid in Full" in turn, is defined as "[t]he amount owed to the parties and in the amounts listed and calculated on the schedule attached hereto as Exhibit A to be update monthly to reflect accrued and unpaid interest and fees allowable under the Indentures." (A128).

Following briefing, on September 27, 2019, the Bankruptcy Court issued a bench ruling and the Order which is the subject of this appeal.  (B.D.I. 972, 974).  As set forth in the transcript of the bench ruling, the question before the Bankruptcy Court was one of contract interpretation: "whether the terms of the settlement agreement provide for termination or the continuation of the joint monetization process of the Group A portfolio companies at the conclusion of the 15-month window."  (9/27/19 Hr'g Tr. at 3:9-14 (A-5)).  The Bankruptcy Court identified the applicable standard:

> [T]here is no dispute that under Delaware's principles of contract interpretation, the threshold inquiry, when presented with a contract dispute is whether the language at issue in the context of the overall structure of the applicable contract is clear and unambiguous; in other words, does the language convey an unmistakable meaning? If it does, then the writing, itself, is the sole source for gaining [an] understanding of the contracting part[ies'] intent[,] and its language will control.  Importantly, the fact that the parties dispute how to interpret the settlement agreement does not mean that it's ambiguous; rather, contracts are ambiguous when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.  If reasonable minds [will] differ as to a contract's meaning, [there is] ambiguity, and, thus, a factual dispute results and the Court must consider admissible, extrinsic evidence to determine intent.

(*Id.* at 4:2-4:19).  Here, each party argued that the Settlement Agreement was unambiguous but disputed how it must be interpreted.  Based on a thorough review of the parties' arguments, the Bankruptcy Court did not find that the provisions in controversy were reasonably or fairly susceptible of different interpretations or may have two or more different meanings.  According to the Bankruptcy Court, the parties' use of "until such time as" in Paragraph 12 of the Settlement Agreement "could not be clearer."  (9/27/19 Hr'g Tr. at 10:8-11 (A12)).  The monetization process ends only when the parties achieve their goal or mutually agree to give up.  Nowhere in the Settlement Agreement did the parties agree that the monetization process would occur only during the 15-month litigation armistice.  "While Ms. Tilton and the Patriarch stakeholders argue that the 15-month window was a prerequisite or condition of the monetization process, the terms of the

document simply do not reflect such an agreement . . . ." (*Id.* at 9:16-23 (A11)).  The Bankruptcy Court rejected Appellants' argument that the parties linked the monetization process to the 15-Month Window by using the phrase "as outlined herein" in Paragraph 12.  The Bankruptcy Court further rejected Appellants' arguments that the Debtors' plain language reading of the Settlement Agreement was absurd, as it would force Ms. Tilton to work "in perpetuity" for "no compensation."  (*See* D.I. 4 ¶¶ 3-4).

Following the Bankruptcy Court's bench ruling, Appellants made an oral motion for stay pending appeal, which was denied by the Bankruptcy Court.  The Order was entered the same day, September 27, 2019.  On September 30, 2019, the Settlement Agreement's 15 Month Window expired and, with it, the provisions staying litigation and tolling the parties' causes of action.  Consistent with the express right of "all parties to the chapter 11 cases" to "exercise any and all rights available under applicable law" upon expiration of the 15-Month Window, Appellants re-commenced certain actions and instituted new litigation.

Appellants timely appealed the Order on October 4, 2019.  (D.I. 1).  On October 15, 2019, Appellants filed a motion for stay pending appeal in this Court.  On November 1, 2019, Appellants filed an unopposed motion for expedited consideration.  On December 19, 2019, this Court entered a Memorandum Order denying Appellants' motion for stay pending appeal[6] and granting the request for expedited consideration.  (D.I. 43).

---

[6]     The Court evaluated Appellants' likelihood of success on the merits and irreparable injury absent a stay, and, based on the Court's determination that the Appellants failed to carry their burden as to either element, the Court found no further analysis was required.  *See In re Revel AC*, 802 F.3d 558, 571 (3d Cir. 2015) ("If the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.")  Although not required, the Court further determined that the remaining factors weighed against granting a stay of the Order pending appeal.

Briefing on the merits of the appeal is complete.  (D.I. 38, 39, 41, 42, 44).[7]  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.   <u>JURISDICTION AND STANDARD OF REVIEW</u>

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1).  The Third Circuit "take[s] a pragmatic approach" to finality in the bankruptcy context by "examin[ing] the practical effect of the court's ruling."  *In re Klaas*, 858 F.3d 820, 826 (3d Cir. 2017).  Bankruptcy orders concerning "issues central to the progress of the bankruptcy petition," and issues "likely to affect the distribution of the debtor's assets, or the relationship among creditors," are routinely treated as final.  *In re Owens Corning*, 419 F.3d 195, 203 (3d Cir. 2005) (quoting *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 98 (3d Cir. 1988)).  The relaxed standard avoids "wast[ing] time and resources" by "delay[ing] resolution of discrete claims."  *Id.* (quoting *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988)).  The Order on appeal decides a discrete legal issue as to the parties' obligations under the agreed monetization process, which affects the disposition of the estate's assets and relationships among the creditors and debtors.  Accordingly, the Order is final, and the Court has jurisdiction over the appeal.

This Court "review[s] the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof."  *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envt'l Energy, Inc.)*, 188 F.3d 116, 122 (3d Cir. 1999).  When interpreting the legal effect of a contract, this Court reviews the lower court's legal determinations *de novo.  See Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 413 (3d Cir. 2011) ("We also

---

[7]      MBIA filed a joinder to the Debtors' answering brief.  (D.I. 42).

review the legal interpretation of contractual language *de novo*."); *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1254 (3d Cir. 1993).  As the Settlement Agreement is unambiguous, *de novo* is the appropriate standard of review by this Court.  *See, e.g., Sköld v. Galderma Labs. L.P.*, 917 F.3d 186, 191 n.9 (3d Cir. 2019) ("[W]e review the interpretation of an unambiguous contract de novo.").

## III.   <u>DISCUSSION</u>

The Bankruptcy Court determined that "[t]he plain terms and the clear limits that are set forth in the settlement agreement demonstrate to the Court that the parties did not intend for the monetization process to end at the conclusion of the 15-month window."  (9/27/19 Hr'g Tr. at 13:8–11 (A15)).  This Court has previously instructed that "[i]f contractual language is plain and clear on its face, *i.e.*, it conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."  *Novel Drug Sols., LLC v. Imprimis Pharm., Inc*., Civ. No. 18-539 (MN), 2018 WL 4795627, at *3 (D. Del. Sept. 26, 2018) (citations and quotations omitted).  And "when two sophisticated parties bargain at arm's length and enter into a contract, the presumption is even stronger that the contract's language should guide the Court's interpretation."  *JFE Steel Corp. v. ICI Ams., Inc.,* 797 F. Supp. 2d 452, 469 (D. Del. 2011) (citing *Progressive Int'l Corp v. E.I. du Pont de Nemours & Co.*, 2002 WL 1558382, at *6-7 (Del. Ch. July 9, 2002)).

Here, the language of Paragraph 12 is unambiguous:  "Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies ***until such time as*** the [sic] (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date."  (Settlement Agreement ¶ 12 (A131) (emphasis added)).  The Bankruptcy Court determined that the expiration of the monetization process is addressed by Paragraph 12 of the Settlement Agreement.  As the Bankruptcy Court noted, "The []phrase 'until such time' could not be clearer.

The monetization process ends when one of two conditions occur: mutual agreement in writing to terminate the settlement agreement or the full-payment date." (9/27/19 Hr'g Tr. 10:8-12 (A12)).

The Court agrees that "nowhere . . . in the settlement agreement do the parties limit the [monetization] process to . . . the 15-month window or make it contingent on the 15-month window's armistice." (*Id*. at 9:19-23 (A11)). "[T]he terms of the document simply do not reflect such an agreement." (*Id*. at 9:18-19 (A11)). Thus, the "only reasonable interpretation of the settlement agreement as a whole" is that it "unambiguously provides for the continuation of the monetization process following the expiration of the 15 Month Window." (*Id*. at 9:6-10 (A11)). "Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co*., 616 A.2d 1192, 1196 (Del. 1992).

The Bankruptcy Court acknowledged that the parties "may [have] intended the monetization process to conclude at the expiration of the 15-month window," (9/27/19 Hr'g Tr. at 14:23–15:1), but it was not the Bankruptcy Court's role "to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not," *DeLucca v. KKAT Mgmt. L.L.C*., 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006) – nor is it appropriate for this Court to do so. "Rather, it is the court's job to enforce the clear terms of contracts." *Id.* As set forth below, Appellants' arguments to the contrary are not compelling.

A.    **The Bankruptcy Court Properly Construed the Settlement Agreement as a Whole**

In interpreting a contract, courts must "construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co*., 498 A.2d 1108, 1113 (Del. 1985); *see also In re G-I Holdings, Inc*., 755 F.3d 195, 202 (3d Cir. 2014) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all

provisions therein.  A court should interpret the contract in such a way as to not render any of its provisions illusory or meaningless.") (citations and quotations omitted).  However, "[c]ontract language cannot be construed in a vacuum."  *In re Cendant Corp. Sec. Litig.*, 181 F. App'x 206, 209 (3d Cir. 2006).  "Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."  *In re Stone & Webster*, 558 F.3d 234, 246 (3d Cir. 2009) (quoting *E.I. du Pont*, 498 A.2d at 1113).

Appellants argue that the Bankruptcy Court's Order compelling continuation of the monetization process after expiration of the 15-Month Window "runs counter to" the Settlement Agreement's overall scheme and its component parts – as well as a proper reading of Paragraph 12 itself – and should be reversed.  (*See* D.I. 38 at 17-22).  Appellants argue that:

> The deal at the heart of the Settlement Agreement – its purpose and intent, as reflected in its four corners – was to provide a 15-month reprieve from litigation and other activities antithetical to successful monetization so that the parties could work together during that "breathing spell" to monetize the Group A Portfolio Companies and maximize value for all stakeholders.  Ms. Tilton would be temporarily obligated, during that 15 Month Window, to work jointly with the CRO; and in exchange, the CRO would be able to participate in Group A Portfolio Company sales and refinancing in which the CRO (and Debtors) otherwise had no right to be involved. That is why the Settlement Agreement time and again delineates the various respects in which the parties will return to the *status quo ante* upon expiration of the 15 Month Window (with limited exceptions not relevant here).  It is in the context of, and with reference to, this overall scheme that the Settlement Agreement's constituent parts must be construed.

(*Id*. at 17-18 (internal citations omitted)).  According to Appellants, the Bankruptcy Court has failed to read the very provision on which its Order is premised – Paragraph 12, "which requires that Ms. Tilton and the CRO 'work jointly *as outlined herein* to monetize the Group A Portfolio Companies' unless one of two conditions are met" – "within the context of the entire instrument"

as required.  (*Id*. at 18 (quoting *Hudson v. D & V Mason Contractors, Inc*., 252 A.2d 166, 169 (Del. Super. Ct. 1969)).  According to Appellants, "the Bankruptcy Court contravened this canon of interpretation by divorcing the monetization process from the 15-Month Window to which it is deliberately and inextricably tied in the Settlement Agreement."  (*Id.* at 18).  The Court disagrees that any language in the Settlement Agreement deliberately or inextricably ties the monetization process to the 15-Month Window.

Although Appellants rely primarily on Paragraph 12, Appellants' briefs ignore the language of Paragraph 12, which includes the phrase "until such time as."  For example, on page 11 of Appellants' opening brief, Appellants address the language at issue by stating that parties agreed to engage in joint monetization effort "*unless* certain conditions were met prior to expiration of that 15 month period."  (D.I. 38 at 11) (emphasis added)).  The Settlement Agreement, however, says that that the parties must work jointly "until such time as" they meet one of those conditions.  The key phrase "until such time as" appears once in Appellants' opening brief, in a block quote.  (D.I. 38 at 11).  Even then, Appellants preface the block quote by stating that the Settlement Agreement requires the parties to work jointly "unless certain conditions were met."  There are several other examples.[8]  The Court agrees with the Debtors that the fact that Appellants must manipulate Paragraph 12 to support their interpretation demonstrates the

---

[8]     *See* Appellants' Opening Brief, D.I. 38 at 2 (stating that the parties agreed to work jointly "'to monetize the Group A Portfolio Companies' *unless* (i) 'the parties each agree in writing to terminate this settlement agreement . . . in their sole respective discretion' or (ii) certain stockholders are repaid 'in [f]ull' . . . .;" Appellants thereby interrupt a direct quotation of Paragraph 12 specifically to change the phrase "until such time as" to the word "unless," which obscures the fact that the events identified in Paragraph 12 are set endpoints) (emphasis added); *see also id.* at 18 (stating that Paragraph 12 "requires that Ms. Tilton and the CRO 'work jointly as outlined herein to monetize the Group A Portfolio Companies' *unless* one of two conditions are met" (emphasis added)); *id.* at 20 (stating that Settlement Agreement terminates "if" conditions are met and omitting "until such time as" from quotation of Paragraph 12).

weakness of their interpretation and the clarity of the actual words used.  The Court agrees that Paragraph 12 is clear that the monetization process continues *until* one of the events identified in Paragraph 12 occurs.

Appellants further argue that the Bankruptcy Court erroneously concluded that none of the provisions in the Settlement Agreement limit the monetization process to the 15-Month Window while "ignoring numerous provisions that do just that."  (*See* D.I. 38 at 18-19).  Appellants focus on Paragraph 12's statement that the parties agreed to "work jointly *as outlined herein* to monetize the Group A Portfolio Companies . . . ."  According to Appellants, "the 15 Month Window's temporal limitation is clearly incorporated into Paragraph 12 when it sets out – before listing the conditions for early termination – the threshold constraint that Tilton and the CRO 'shall work jointly *as outlined herein* to monetize the Group A Portfolio Companies.'"  (*Id.* at 20).

The Court cannot agree that the phrase "as outlined herein" implicitly incorporates the expiration of the 15-Month Window as a "third event" that would terminate the monetization process.  (D.I. 38 at 18).  The Bankruptcy Court determined Appellants' interpretation was "unreasonable":

> That term is a dependent clause modifying the obligation of Ms. Tilton and the CRO to work jointly to monetize the Group A portfolio companies. . . .   [T]he phrase points the reader to the provisions of the settlement agreement that describe the agreed-upon manner in which the monetization process will occur, such as the agreements of Paragraph 10 that discuss information sharing, coordinating meetings, selecting professionals, and the like.

(9/27/19 Hr'g Tr. at 12:22-13:5 (A14-A15)).  As the Bankruptcy Court explained, "The parties to the settlement agreement used two key defined terms . . . to establish temporal limitations on the agreements set forth therein: 'the 15-month window' and the 'full-payment date.'"  (*Id.* at 11:14-21 (A13)).  The Bankruptcy Court then identified which provisions of the Settlement Agreement fell into each bucket.  If the parties had intended for the monetization process to go into the bucket

of agreements that expire at the conclusions of the 15-Month Window, "they could have easily drafted Paragraph 12 to reflect such an intent . . . ." (*Id*. at 10:15-17 (A12)).  They did not.  As the Bankruptcy Court observed, "[t]he parties clearly knew how to make certain agreements contingent on the 15-month window and they did not do so, with respect to the monetization process." (*Id*. at 11:11-12:17).

According to Appellants, because the phrase "as outlined herein" refers to "each and every other part of the Settlement Agreement," it was unnecessary for the parties to recite their intent that the monetization process would terminate upon expiration of the 15-Month Window. (*See* D.I. 38 at 21).  The Court must agree with the Debtors, however, that the case upon which Appellants rely for this broad proposition does not support their argument.  *See Hudson*, 252 A.2d at 169.  In that case, a contractor sought to cancel a contract to build a house after construction became more expensive than anticipated.  *Hudson*, 252 A.2d. at 168.  The contractor relied on a provision in the construction contract which provided that the contractor could cancel the contract by returning the plaintiff's down payment if the contractor "is unable to construct or complete said premises or make title as herein provided . . . ." *Id*.  According to the *Hudson* court, the phrase "as herein provided" contextualized the specific circumstances that would give the contractor the ability to cancel the contract:  "The inability to perform referred to in paragraph 13 must, therefore, be consistent with the inability to perform set forth in more detail in paragraph 26." *Id*. at 169.  The Debtors are correct that *Hudson* does not stand for the broad proposition that the phrase "as outlined herein" incorporates by reference every other part of the Settlement Agreement.  Rather, *Hudson* stands for the unremarkable proposition that courts will interpret such language using common sense and examining the particular context in which the language appears, just as the Bankruptcy Court did here.  (9/27/19 Hr'g Tr. at 12:18–13:5 (A14-A15)).

Appellants further argue that the Bankruptcy Court failed to interpret the Settlement Agreement holistically because it "ignored numerous provisions" that limited the monetization process to the 15-Month Window.  Appellants cite provisions that:

- toll causes of action and stay litigation among the parties during the 15-Month Window only (Settlement Agreement ¶¶ 14, 15, 19) – conditions, Appellants argue, "that the parties recognized as an essential to joint monetization process" (D.I. 38 at 19);

- guarantee that Ms. Tilton will remain in her positions at the helm of the Group A Portfolio Companies during the 15-Month Window only (Settlement Agreement ¶ 9) – a prerequisite, Appellants argue, for Ms. Tilton's ability to jointly monetize the companies (D.I. 38 at 18);

- require that Ms. Tilton "first consult[] with the CRO" before taking certain actions on behalf of the Portfolio Companies, and that she operate the Portfolio Companies in the "ordinary course" during the 15-Month Window only (Settlement Agreement ¶ 20); having expired, Appellants argue, "Ms. Tilton is authorized to take unilateral actions on behalf of the Portfolio Companies, including actions outside of the ordinary course of business that may frustrate any prospect of joint monetization" (D.I. 38 at 19); and

- bar the Zohar Funds' administrative agent, during the 15-Month Window only, from taking certain actions against the Portfolio Companies that would impede their monetization (Settlement Agreement ¶ 6).

(*See* D.I. 38 at 18-19).  Appellants argue that expiration of these provisions following the 15-Month Window "renders the prospect of a 'joint' monetization process impracticable, to say the least" and that, "[i]ndividually and together, these provisions leave no doubt that the joint monetization process is inextricably intertwined with, dependent on, and temporally limited to, the Settlement Agreement's 15 Month Window."  (*Id.*)

As the Bankruptcy Court explained, however, none of these provisions indicates that the parties agreed that the monetization process would occur only during the 15-Month Window: "the terms of the document simply do not reflect such an agreement."  (9/27/19 Hr'g Tr. at 9:18–19

17

(A11)).   Simply  put,  "nowhere . . .  in  the  settlement  agreement  do  the  parties  limit  the [monetization] process to . . . the 15-month window or make it contingent on the 15-month window's armistice." (*Id.* at 9:19–23 (A11)).  The key phrase "until such time as" is unambiguous, and "[c]ourts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." *Thone-Poulenc*, 616 A.2d at 1196.  That the Bankruptcy Court declined to read into the Settlement Agreement terms which are not there does not undermine its holistic reading of the Settlement Agreement.

### B.      The Bankruptcy Court's Interpretation Did Not Nullify Essential Terms

"Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless." *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992).  Appellants argue that the Bankruptcy Court's erroneous interpretation of the Settlement Agreement guts or renders meaningless essential terms of the parties' agreement.  (*See* D.I. 38 at 22-25).

Appellants  argue  that  Paragraph  25  authorizes  the  CRO  to  "tak[e]  action  to  remove [Ms.] Tilton as a director or manager of the Group A Portfolio Companies" "upon expiration of the 15 Month Window."  (Settlement Agreement ¶ 25 ("Upon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law")).  Because Ms. Tilton must retain "full authority on behalf of" the Group A  Companies  pursuant  to  Paragraph  10  if  she  is  required  to  jointly  monetize  them,  Appellants argue that the Bankruptcy Court's interpretation thus depends upon the non-exercise of rights that Paragraph 25 grants.  According to Appellants, this Court should therefore "decline[] to adopt an interpretation" of Paragraph 12 that "rob[s]" Paragraph 25 of its meaning.  (D.I. 38 at 23 (citing *Martin Marietta*, 68 A.3d at 1221)).

The Bankruptcy Court, however, considered and rejected all of the same arguments that Appellants make to this Court about how the monetization process cannot coexist with the potentially value-destructive actions that the Settlement Agreement permits the parties to take after expiration of the 15-Month Window.  As the Bankruptcy Court explained, the fact that the parties can start taking forceful action after 15 months could be viewed as a useful feature of the Settlement Agreement, not a fatal inconsistency:

> Even if the parties agreed to the 15-month armistice to preserve value of the portfolio companies and to avoid distraction from the monetization process, I do not find it absurd that the process continues following the 15-month window.

> Rather, one could easily argue that the looming expiration of the 15-month window over the monetization process was intended to incentivize all parties to complete the process and reach the full-payment date within the 15-month window to avoid the potential value-destructive activities that could follow.  And one can argue that the expiration of the armistice will continue to incentivize the monetization process.

(9/27/19 Hr'g Tr. at 13:15-14:2 (A15-16)).  The Court agrees that continuing the monetization process after expiration of the 15-Month Window does not nullify any party's right to take the actions described elsewhere in the Settlement Agreement.  The parties still have those rights during the continued monetization process, should they choose to exercise them.

Appellants further argue that Paragraphs 3 and 10 conflict with one another because Paragraph 10 outlines the joint effort to monetize the Portfolio Companies, whereas Paragraph 3 states that the parties will negotiate how to monetize the Group B Portfolio Companies. (*See* D.I. 38 at 24-25).  According to Appellants, there would be no reason for those negotiations if the monetization process described in Paragraph 10 were still in effect after expiration of the 15-Month Window.  According to the Debtors, this argument "overlooks the fact that Paragraph 10 provides only a general overview of the joint monetization effort and, further, that Paragraph 10

provides more explicit guidelines for the Group A Portfolio Companies than it does for the Group B Portfolio Companies." (D.I. 40 at 18).  For instance, Paragraph 10 provides that "Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales." (*Id.*)  As the Debtors point out, Paragraph 10 is not similarly explicit about the process for monetizing the Group B Portfolio Companies.  According to the Debtors, this is in line with the parties intent that "under the Settlement Agreement, the parties were to sell the Group A Portfolio Companies first, with the Group B Portfolio Companies to follow if the 15-Month Window expired before the Settlement Agreement terminated or the Zohar Funds' noteholders received payment in full.  Paragraph 3 thus reserved discussions over the Group B Portfolio Companies until after the initial phase of monetization." (*Id.*).  If the parties still needed to monetize the Group B Portfolio Companies after that initial phase, negotiations over those companies would occur 15 (or 18) months into the parties' joint monetization effort.  Thus, according to the Debtors, the Bankruptcy Court's interpretation does not nullify Paragraph 3 or Paragraph 10.

The Court agrees that Paragraphs 3 and 10 are in accord and recognize the practical reality that the addition of the Group B Portfolio Companies to the ongoing monetization effort would require additional collaboration between the CRO and Ms. Tilton once the 15-Month Window expired.  Indeed, adopting Appellants' position, and interpreting the Settlement Agreement to require that the monetization process ended at the same time as the 15-Month Window, would appear to render Paragraphs 3 and 10 "meaningless and nonsensical." (9/27/19 Hr'g Tr. at 14:11 (A16)).  Paragraph 3 is explicit that monetization continues after expiration of the 15-Month Window: "if the Full Payment Date does not occur within the 15 Month Window, Ms. Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies." (Settlement Agreement ¶ 3 (A129)).  And Paragraph 10 outlines the joint process to monetize the

20

Group B Portfolio Companies – which takes place only after expiration of the 15-Month Window. (*See id*. ¶ 10 (A130–A131)).  Thus, the joint process to monetize the Portfolio Companies must continue after expiration of the 15-Month Window if Paragraphs 3 and 10 of the Settlement Agreement are to have any meaning.  By contrast, Appellants' "as outlined herein" argument would render the express language of Paragraph 12 meaningless.

Finally, Appellants cite Paragraph 14's reference to "the 15 Month Window . . . with respect to the Monetization Process," arguing that the Bankruptcy Court's interpretation "ignores Paragraph 14's unambiguous language linking" the monetization process and the 15-Month Window.  (D.I. 38 at 19, 24).  The Court does not agree.  The full text of Paragraph 14 states:

> The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window.  The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to the Monetization Process involving any Group A Portfolio Company.

(Settlement Agreement ¶ 14 (A131)).  The plain meaning of this provision is that the Status Quo Orders will not have any effect on the monetization process during the 15 months that the parties agreed to stay those orders.  The provision neither states nor implies that the monetization process is only 15 months long.  Thus, the Bankruptcy Court did not ignore the "unambiguous language" in Paragraph 14.  In sum, this Court is "unable to identify any provision that would be rendered meaningless or nonsensical if the monetization process were to continue . . . " (9/27/19 Hr'g Tr. at 14:3-5 (A16)).

### C.   The Bankruptcy Court Did Not Adopt an Interpretation that Produces Absurd Results

"Delaware adheres to the 'objective' theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."  *Osborn*, 991 A.2d at 1159 (citation omitted).  "An interpretation is unreasonable if it 'produces an absurd

result or one that no reasonable person would have accepted when entering the contract.'"
*AgroFresh, Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 656 (D. Del. 2017) (quoting *Osborn v.
Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (declining "to accept an interpretation that would produce
an absurd result").  Appellants assert that "the Bankruptcy Court erred by adopting an
interpretation of Paragraph 12 that produces patently absurd results that no reasonable person
would have accepted – and which Patriarch did not accept – when negotiating the Settlement
Agreement."  (D.I. 38 at 25-26).

First, Appellants argue that "[i]t stretches the bounds of reason" to conclude that any person
– let alone a sophisticated businesswoman with numerous other business ventures – would have
agreed to participate in mandatory joint monetization efforts of indeterminate and potentially
perpetual duration."  (*Id.* at 26).  The conclusion is even more preposterous here, Appellants argue,
where the consideration – namely, a stay of litigation – was limited to a period of 15 months.[9]
(*See id.*)  The Bankruptcy Court concluded that its interpretation did not produce an absurd result
because "Ms. Tilton's cooperation in the monetization process is not endless," as "[t]he clear terms
indicate that it will end when the full-payment date is reached or the parties mutually agree to
terminate the settlement agreement."  (9/27/19 Hr'g Tr. at 14:19-22 (A-16)).

The Debtors argue that "[s]ophisticated parties are bound by the unambiguous language of
the contracts they sign."  (D.I. 40 at 19 (citing *Progressive Int'l*, 2002 WL 1558382, at *1)).
Indeed, "[r]equiring parties to live with the language of the contracts they negotiate holds even

---

[9]  Ms. Tilton's assertion that the consideration for her continued obligation to participate in
the monetization process "was limited to a now-expired period of 15 months" is contrary
to the unambiguous term of the Settlement Agreement.  (*See* D.I. 38 at 26).  Paragraph 18
of the Settlement Agreement provides Ms. Tilton with her bargained-for compensation in
connection with any monetization transaction, along with Ms. Tilton's receipt of fees and
payments owed by the Portfolio Companies to her in the ordinary course to the extent she
continues in her roles as director, officer, or management-services provider, as applicable.

greater force when, as here, the parties are sophisticated entities that bargained at arm's length." *Akorn, Inc. v. Fresenius Kabi AG,* 2018 WL 4719347, at *60 (Del. Ch. Oct. 1, 2018) (citations and quotations omitted), *aff'd*, 198 A.3d 724 (Del. 2018).  Additionally, the Debtors argue parties frequently enter into open-ended contracts.  The Debtors cite the *Hudson* case, upon which Appellants rely, as a good example.  In that case, a contractor agreed to build a house but sought to cancel the contract after construction became more difficult than anticipated.  *Hudson*, 252 A.2d at 168.  The court explained, however, that such excuses "cannot excuse a party from the performance of an absolute and unqualified undertaking to do a thing that is possible and lawful . . . .  A contract is not invalid, nor is the obligor therein in any manner discharged from its binding effect, because it turns out to be difficult or burdensome to perform."  *Id.* at 169.  Here, as in *Hudson*, the Debtors argue, any purported difficulty of monetizing the Portfolio Companies does not excuse Ms. Tilton from her obligations under the Settlement Agreement.

The Court agrees with the Debtors.  Holding Ms. Tilton to the terms of the Settlement Agreement that she agreed to is not absurd simply because monetization of the Portfolio Companies turns out to be difficult or burdensome.  Ms. Tilton bargained for a stay of litigation against her during the 15-Month Window and enjoyed the benefit of that bargain.  Moreover, the Settlement Agreement is not "endless" (*see* D.I. 38 at 4) just because it does not conclude on a date certain.  The Bankruptcy Court rejected the argument that it would be "unfair" to Ms. Tilton to enforce the terms of the Settlement Agreement.  As the Bankruptcy Court explained, "there's no dispute that consideration was exchanged for the agreements embodied in the settlement agreement and [that] Ms. Tilton's cooperation in the monetization process is not endless." (9/27/19 Hr'g Tr. at 14:16–19 (A16)).  Rather, the "clear terms" of the Settlement Agreement "indicate that it will end when the full-payment date is reached or the parties mutually agree to terminate the settlement agreement."  (*Id.* (A16)).

Second, Appellants rehash their argument that it would be absurd to pursue monetization once the 15-Month Window has expired.  Appellants argue that the Bankruptcy Court's Order "illogically compels the joint monetization process to continue concurrent with value-destroying litigation that effectively frustrates any prospect of full repayment."  (D.I. 38 at 27).  As the Debtors point out, however, the expiration of the 15-Month Window permitted – but in no way required – parties to resume value-destructive litigation.  (D.I. 40 at 21).  Moreover, pending litigation does not foreclose the purchase and sale of companies; as the Bankruptcy Court observed, the "looming expiration of the 15-month window" could actually "incentivize all parties to complete the process and reach the full-payment date within the 15-month window to avoid the potential value-destructive activities that could follow."  (9/27/19 Hr'g Tr. at 13:20-25 (A15)).  Accordingly, "[e]ven if the parties agreed to the 15-month armistice to preserve value of the portfolio companies and to avoid distraction from the monetization process," it is "not . . . absurd that the process continues following the 15-month window."  (*Id.* at 13:15-19 (A15)).

At the conclusion of the 15-Month Window, Appellants elected to "re-commence[] certain actions and institute[] new litigation as it deemed appropriate and necessary," as was the Appellants' right under the Settlement Agreement.  (*See* D.I. 38 at 16).  The Court agrees with the Debtors that it may be absurd to pursue potentially value-destructive litigation now while the parties remain jointly obligated to monetize the Portfolio Companies, rather than after that process is complete and the parties have obtained maximum value for the Portfolio Companies.  That the Settlement Agreement permits Ms. Tilton to resume litigation, however, in no way renders absurd the Bankruptcy Court's interpretation of the Settlement Agreement or its results.

### D.      Remand for Consideration of Extrinsic Evidence Is Not Warranted

"When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to

resolve the ambiguity." *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014). A contract may be ambiguous even where a proffered interpretation "seems strained" and a competing interpretation "seems more linguistically likely," as long as the court "cannot rule [either] out as a possible reading." *Sunline*, 206 A.3d at 848, 839.

Although maintaining that "the only reasonable interpretation of the Settlement Agreement, when read as a whole, is that it limits the mandatory joint monetization process for the Group A Portfolio Companies to a period of 15 months," Appellants assert that, "at the very least, . . . the Settlement Agreement is ambiguous, in which case this Court should vacate the Bankruptcy Court's Order and remand with instructions to permit the discovery sought by Patriarch and the consideration of extrinsic evidence concerning the parties' intent." (D.I. 38 at 30). Appellants argue that when Paragraph 12 is construed not in isolation but in the context of the overall structure of the contract, it is at the very least "susceptible [to the] reasonable interpretation" that the monetization process for the Group A Portfolio Companies is limited to a period of 15 months. (*See* D.I. 38 at 30 (citing *Salamone*, 106 A.3d at 374). At a minimum, Appellants contend they have identified "conceivably conflicting terms that cannot be indisputably reconciled without resort to extrinsic evidence and patently absurd results that the Bankruptcy Court's interpretation produces." (*Id.* (internal citations and quotation marks omitted)).

Conversely, the Debtors argue that the parties' use of the phrase "until such time as" in Paragraph 12 of the Settlement Agreement "could not be clearer," and the Delaware Supreme Court has "held unequivocally that extrinsic evidence is not to be used to interpret contract language where that language is plain and clear on its face." *O'Brien v. Progressive N. Ins. Co*., 785 A.2d 281, 289 (Del. 2001) (citations and quotations omitted). The Debtors further argue that the *Sunline* case relied upon by Appellants does not help its cause. (*See* D.I. 38 at 30 (citing *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836 (Del. 2019)).

In *Sunline*, the contract at issue stated that it was for a term of just one year but also stated that it "shall remain in effect until the Master Agreement is expired or terminated." *Id*. at 839 (quotations omitted). Thus, the contract stated two different end dates that were in direct conflict with one another. The Delaware Supreme Court explained the issue: "So which governs, which controls? Both terms are clear in isolation; neither is more general or specific than the other; and reading one to control would cause the other to be a mere surplusage." *Id*. at 847.

As the Debtors point out, however, *Sunline* supports the proposition that the Settlement Agreement is unambiguous. Unlike the contract at issue in the *Sunline* case, there is no language in the Settlement Agreement that conflicts with the plain language of Paragraph 12. The Settlement Agreement has just one clause, Paragraph 12, that states when the monetization process ends. There is no second clause stating a different end date for the monetization process: "nowhere . . . in the settlement agreement do the parties limit the [monetization] process to . . . the 15-month window or make it contingent on the 15-month window's armistice." (9/27/19 Hr'g Tr. at 9:19–23 (A11)). "While Ms. Tilton and the Patriarch stakeholders argue that the 15-month window was a prerequisite or condition of the monetization process, the terms of the document simply do not reflect such an agreement . . . ." (*Id.* at 9:16–29 (A11)).

The Court rejects Appellants' remaining arguments in support of remand as well. Appellants contend that the Court should consider extrinsic evidence because the Zohar Funds "expressly relied on one of the paragraphs requiring 'follow-up negotiation and specifics' in their briefing below." (D.I. 38 at 31). In the briefing Appellants refer to, however, the Zohar Funds explained that the phrase "work jointly as outlined herein" refers to the general contours of the monetization process, which are set forth in various places in the Settlement Agreement, including in Paragraph 4 (which did indeed contemplate further negotiations over sale process milestones). The Court agrees this is irrelevant, as neither the Zohar Funds' argument nor the Bankruptcy

Court's analysis depends in any way on the actual sale process milestones.  Appellants further argue that language in two pleadings filed in the bankruptcy case contain "representations" by the Zohar Funds that "leave no doubt" that the Zohar Funds intended the monetization process to expire after 15 months.  (D.I. 38 at 31).  The Court agrees with the Debtors that this argument fails.

The Appellants cannot point to extrinsic evidence in their to attempt to show ambiguity.  "Delaware courts are obligated to confine themselves to the language of the document and not to look to extrinsic evidence to find ambiguity."  *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 289 (Del. 2001); *see also Eames v. Nationwide Mut. Ins. Co.*, 412 F. Supp. 2d 431, 436 (D. Del. 2006) ("The inquiry as to whether an ambiguity exists must focus on the contract.").  Second, the parties' subjective intent does not control here.  "[C]ase law and contract law are clear that the subjective intent of a party is not controlling.  What matters is what a reasonable person reading the contract objectively would think it means."  *Unwired Planet, Inc. v. Microsoft Corp.*, 193 F. Supp. 3d 336, 344 (D. Del. 2016) (quoting *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *16 (Del. Ch. Oct. 30, 2015))).  "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."  *Rhone-Poulenc*, 616 A.2d at 1196; *see also Unwired Planet*, 193 F. Supp. 3d at 344 ("What matters is what a reasonable person reading the contract objectively would think it means." (citations and quotations omitted)).

This Court will not reach to create ambiguity where none exists.  As the Delaware Supreme Court has instructed, courts must "not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."  *Rhone-Poulenc*, 616 A.2d at 1196.  Indeed, "creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented."  *Id.*

## IV.   <u>CONCLUSION</u>

The Bankruptcy Court properly interpreted the plain and unambiguous language of the Settlement Agreement and, therefore, the Bankruptcy Court's September 27, 2019 Order (B.D.I. 974) is AFFIRMED.  A separate Order shall be entered.